Nos. 2-08-0959, 2-08-1037, 2-08-1137,
1-08-3008, 1-08-3030, 1-08-3054, 1-08-3313 cons.  Filed:  9-30-10

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| COMMONWEALTH EDISON COMPANY, | ) | On Petition for Administrative Review |
| | ) | from the Illinois Commerce Commission. |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 07--0566 |
| | ) | |
| ILLINOIS COMMERCE COMMISSION; | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | |
| ex rel. LISA MADIGAN, THE ATTORNEY | ) | |
| GENERAL; AARP; AARP ILLINOIS; | ) | |
| BLUESTAR ENERGY SERVICES, INC.; | ) | |
| BUILDING OWNERS AND MANAGERS | ) | |
| ASSOCIATION OF CHICAGO; CHICAGO | ) | |
| TRANSIT AUTHORITY; CITIZENS | ) | |
| UTILITY BOARD; CHRYSLER, LLC; | ) | |
| THE CITY OF CHICAGO; THE | ) | |
| COMMERCIAL GROUP (styled as such | ) | |
| collectively from the following petitioners: Best | ) | |
| Buy Company, Inc.; J.C. Penney Corporation, | ) | |
| Inc.; Macy's, Inc.; Walmart Stores, Inc.); | ) | |
| CONSTELLATION ENERGY | ) | |
| COMMODITIES GROUP, INC.; | ) | |
| CONSTELLATION NEWENERGY, INC.; | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| ENERGY; INTERNATIONAL | ) | |
| BROTHERHOOD OF ELECTRICAL | ) | |
| WORKERS LOCAL UNION NO. 15, | ) | |
| AFL-CIO; ILLINOIS INDUSTRIAL | ) | |
| ENERGY CONSUMERS, a/k/a IIEC | ) | |
| (styled as such collectively from the following | ) | |
| petitioners: Abbott Laboratories, Inc.; | ) | |
| Arcelormittal USA; Caterpillar, Inc.: Citgo, | ) | |
| Inc.; Corn Products International, Inc.; | ) | |
| Daimler Chrysler Corporation; Enbridge | ) | |

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008,
1--08--3030, 1--08--3054, 1--08--3313 cons.

Energy, LP; Exxonmobil; Ford Motor Company;)
Merchandise Mart; Sterling Steel Company, )
LLC; Thermal Chicago Cooling, Inc.; Citco Inc.;)
General Iron Industries, Inc.); NORTHEAST )
ILLINOIS REGIONAL COMMUTER )
RAILROAD CORPORATION, d/b/a Metra; )
NUCOR STEEL KANKAKEE, INC.; THE )
KROGER COMPANY; THE COALITION )
TO REQUEST EQUITABLE ALLOCATION )
OF COSTS TOGETHER, a/k/a "REACT" )
(styled as such collectively from the following )
petitioners: A. Finkl and Sons Company; Alsip )
Paper Condominium Association; Aux Sable )
Liquid Products, LP; The City of Chicago; )
Commerce Energy, Inc.; Flint Hills Resources, )
LLC; Integrys Energy Services, Inc.; )
Metropolitan Water Reclamation District of )
Greater Chicago; PDV Midwest Refining, LLC; )
United Airlines, Inc.; Wells Manufacturing, Inc.);)
RETAIL ENERGY SUPPLY ASSOCIATION, )
a/k/a "RESA" (styled as such collectively from )
the following petitioners: Commerce Energy, )
Inc.; Consolidated Edison Solutions, Inc.; )
Direct Energy Services, LLC; Gexa Energy; )
Hess Corporation; Intergrys Energy Services, )
Inc.; Liberty Power Corporation; Reliant Energy)
Retail Services, LLC; Sempra Energy Solutions;)
Strategic Energy, LLC; Suez Energy Resources )
NA, Inc.; US Energy Savings Corporation); )
and UNIVERSITY OF ILLINOIS, )
                                              )
            Respondents.                       )

---

THE PEOPLE OF THE STATE OF              )      On Petition for Administrative Review
ILLINOIS ex rel. LISA MADIGAN, THE      )      from the Illinois Commerce Commission.
ATTORNEY GENERAL,                       )
                                        )
            Petitioner,                 )
                                        )
v.                                      )      No. 07--0566
                                        )
ILLINOIS COMMERCE COMMISSION;           )
COMMONWEALTH EDISON COMPANY;            )

-2-

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008, 1--08--3030, 1--08--3054, 1--08--3313 cons.

AARP; AARP ILLINOIS; BLUESTAR )
ENERGY SERVICES, INC.; BUILDING )
OWNERS AND MANAGERS ASSOCIATION)
OF CHICAGO; CHICAGO TRANSIT )
AUTHORITY; CITIZENS UTILITY BOARD; )
CHRYSLER, LLC; THE CITY OF CHICAGO;)
THE COMMERCIAL GROUP (styled as such )
collectively from the following petitioners: Best )
Buy Company, Inc.; J.C. Penney Corporation, )
Inc.; Macy's, Inc.; Walmart Stores, Inc.); )
CONSTELLATION ENERGY )
COMMODITIES GROUP, INC.; )
CONSTELLATION NEWENERGY, INC.; )
UNITED STATES DEPARTMENT OF )
ENERGY; INTERNATIONAL )
BROTHERHOOD OF ELECTRICAL )
WORKERS LOCAL UNION NO. 15, )
AFL-CIO; ILLINOIS INDUSTRIAL )
ENERGY CONSUMERS, a/k/a IIEC )
(styled as such collectively from the following )
petitioners: Abbott Laboratories, Inc.; )
Arcelormittal USA; Caterpillar, Inc.; Citgo, )
Inc.; Corn Products International, Inc.; Daimler )
Chrysler Corporation; Enbridge Energy, LP; )
Exxonmobil; Ford Motor Company; )
Merchandise Mart; Sterling Steel Company, )
LLC; Thermal Chicago Cooling, Inc.; Citco, Inc)
General Iron Industries, Inc.); NORTHEAST )
ILLINOIS REGIONAL COMMUTER )
RAILROAD CORPORATION, d/b/a Metra; )
NUCOR STEEL KANKAKEE, INC.; THE )
KROGER COMPANY; THE COALITION )
TO REQUEST EQUITABLE ALLOCATION )
OF COSTS TOGETHER, a/k/a "REACT" )
(styled as such collectively from the following )
petitioners: A. Finkl and Sons Company; )
Alsip Paper Condominium Association; )
Aux Sable Liquid Products, LP; )
The City of Chicago; Commerce Energy, Inc.; )
Flint Hills Resources, LLC; Integrys )
Energy Services, Inc.; Metropolitan Water )
Reclamation District of Greater Chicago; PDV )
Midwest Refining, LLC; United Airlines, )
Inc.; Wells Manufacturing, Inc.); )

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008, 1--08--3030, 1--08--3054, 1--08--3313 cons.

RETAIL ENERGY SUPPLY ASSOCIATION, )
a/k/a "RESA" (styled as such collectively from )
the following petitioners: Commerce Energy, )
Inc.; Consolidated Edison Solutions, Inc.; )
Direct Energy Services, LLC; Gexa Energy; )
Hess Corporation; Intergrys Energy Services, )
Inc.; Liberty Power Corporation; Reliant Energy )
Retail Services, LLC; Sempra Energy Solutions; )
Strategic Energy, LLC; Suez Energy Resources )
NA, Inc.; US Energy Savings Corporation); )
and UNIVERSITY OF )
ILLINOIS, )
           )
           Respondents. )

_____

CITIZENS UTILITY BOARD, )    On Petition for Administrative Review
           )    from the Illinois Commerce Commission.
           Petitioner, )
           )
v. )    No. 07--0566
           )
ILLINOIS COMMERCE COMMISSION; )
COMMONWEALTH EDISON COMPANY; )
THE PEOPLE OF THE STATE OF ILLINOIS )
ex rel. LISA MADIGAN, THE )
ATTORNEY GENERAL; AARP; )
AARP ILLINOIS; BLUESTAR ENERGY )
SERVICES, INC.; BUILDING OWNERS )
AND MANAGERS ASSOCIATION OF )
CHICAGO; CHICAGO TRANSIT )
AUTHORITY; CHRYSLER LLC; THE CITY )
OF CHICAGO; THE COMMERCIAL )
GROUP (styled as such collectively from the )
following petitioners: Best Buy Company, Inc.; )
J.C. Penney Corporation, Inc.; Macy's, Inc.; )
Walmart Stores, Inc.); )
CONSTELLATION ENERGY )
COMMODITIES GROUP, INC.; )
CONSTELLATION NEWENERGY, INC.; )
UNITED STATES DEPARTMENT OF )
ENERGY; INTERNATIONAL )
BROTHERHOOD OF ELECTRICAL )
WORKERS LOCAL UNION NO. 15, )

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008,
1--08--3030, 1--08--3054, 1--08--3313 cons.

| | |
|---|---|
| AFL-CIO; ILLINOIS INDUSTRIAL ENERGY CONSUMERS, a/k/a IIEC (styled as such collectively from the following petitioners: Abbott Laboratories, Inc.; Arcelormittal USA; Caterpillar, Inc.; Citgo, Inc.; Corn Products International, Inc.; Daimler Chrysler Corporation; Enbridge Energy, LP; Exxonmobil; Ford Motor Company; Merchandise Mart; Sterling Steel Company, LLC; Thermal Chicago Cooling, Inc.; Citco Inc.; General Iron Industries, Inc.); NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION, d/b/a Metra; NUCOR STEEL KANKAKEE, INC.; THE KROGER COMPANY; THE COALITION TO REQUEST EQUITABLE ALLOCATION OF COSTS TOGETHER, a/k/a "REACT" (styled as such collectively from the following petitioners: A. Finkl and Sons Company; Alsip Paper Condominium Association; Aux Sable Liquid Products. LP; The City of Chicago; Commerce Energy, Inc.; Flint Hills Resources, LLC; Integrys Energy Services, Inc.; Metropolitan Water Reclamation District of Greater Chicago; PDV Midwest Refining, LLC; United Airlines, Inc.; Wells Manufacturing, Inc.); RETAIL ENERGY SUPPLY ASSOCIATION, a/k/a "RESA" (styled as such collectively from the following petitioners: Commerce Energy, Inc.; Consolidated Edison Solutions, Inc.; Direct Energy Services, LLC; Gexa Energy; Hess Corporation; Intergrys Energy Services, Inc.; Liberty Power Corporation; Reliant Energy Retail Services, LLC; Sempra Energy Solutions; Strategic Energy, LLC; Suez Energy Resources NA, Inc.; US Energy Savings Corporation); and UNIVERSITY OF ILLINOIS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Respondents. | ) |

| | | |
|---|---|---|
| THE BUILDING OWNERS AND MANAGERS ASSOCIATION OF CHICAGO, | ) ) | On Petition for Administrative Review from the Illinois Commerce Commission. |

-5-

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008,
1--08--3030, 1--08--3054, 1--08--3313 cons.

|  |  |  |
|---|---|---|
| Petitioner, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 07--0566 |
| ILLINOIS COMMERCE COMMISSION; | ) | |
| COMMONWEALTH EDISON COMPANY; | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS | ) | |
| ex rel. LISA MADIGAN, THE ATTORNEY | ) | |
| GENERAL; AARP; AARP ILLINOIS; | ) | |

Petitioner,                                                )
                                                           )
                                                           )
v.                                                         )         No. 07--0566
ILLINOIS COMMERCE COMMISSION;                              )
COMMONWEALTH EDISON COMPANY;                               )
THE PEOPLE OF THE STATE OF ILLINOIS                        )
ex rel. LISA MADIGAN, THE ATTORNEY                         )
GENERAL; AARP; AARP ILLINOIS;                              )
BLUESTAR ENERGY SERVICES, INC.;                            )
CHICAGO TRANSIT AUTHORITY;                                 )
CITIZENS UTILITY BOARD; CHRYSLER,                          )
THE CITY OF CHICAGO; THE                                   )
COMMERCIAL GROUP (styled as such                           )
collectively from the following petitioners: Best          )
Buy Company, Inc.; J.C. Penney Corporation,                )
Inc.; Macy's, Inc.; Walmart Stores, Inc.);                 )
CONSTELLATION ENERGY                                       )
COMMODITIES GROUP, INC.;                                   )
CONSTELLATION NEWENERGY, INC.;                             )
UNITED STATES DEPARTMENT OF                                )
ENERGY; INTERNATIONAL                                      )
BROTHERHOOD OF ELECTRICAL                                  )
WORKERS LOCAL UNION NO. 15,                                )
AFL-CIO; ILLINOIS INDUSTRIAL                               )
ENERGY CONSUMERS, a/k/a IIEC                               )
(styled as such collectively from the following            )
petitioners: Abbott Laboratories, Inc.;                    )
Arcelormittal USA; Caterpillar, Inc.; Citgo,               )
Inc.; Corn Products International, Inc.;                    )
Daimler Chrysler Corporation; Enbridge                     )
Energy, LP; Exxonmobil; Ford Motor                         )
Company; Merchandise Mart; Sterling Steel                  )
Company, LLC; Thermal Chicago Cooling,                     )
Inc.; Citco Inc.; General Iron Industries, Inc.);          )
NORTHEAST ILLINOIS REGIONAL                                )
COMMUTER RAILROAD CORPORATION,                             )
d/b/a Metra; NUCOR STEEL KANKAKEE,                         )
INC.; THE KROGER COMPANY;                                  )
THE COALITION TO REQUEST                                   )
EQUITABLE ALLOCATION OF COSTS                              )
TOGETHER, a/ka/ "REACT" (styled as such                    )
collectively from the following petitioners;               )
A. Finkl and Sons Company; Alsip Paper                     )

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008,
1--08--3030, 1--08--3054, 1--08--3313 cons.


Condominium Association; Aux Sable Liquid      )
Products, LP; The City of Chicago; Commerce    )
Energy, Inc.; Flint Hills Resources, LLC;      )
Integrys Energy Services, Inc.; Metropolitan   )
Water Reclamation District of Greater Chicago; )
PDV Midwest Refining, LLC; United Airlines,    )
Inc.; Wells Manufacturing, Inc.);              )
RETAIL ENERGY SUPPLY ASSOCIATION,              )
a/k/a "RESA" (styled as such collectively from )
the following petitioners: Commerce Energy,    )
Inc.; Consolidated Edison Solutions, Inc.;     )
Direct Energy Services, LLC; Gexa Energy;      )
Hess Corporation; Intergrys Energy Services,   )
Inc.; Liberty Power Corporation; Reliant Energy)
Retail Services, LLC; Sempra Energy Solutions; )
Strategic Energy, LLC; Suez Energy Resources   )
NA, Inc.; US Energy Savings Corporation);      )
and UNIVERSITY OF ILLINOIS,                    )
                                               )
     Respondents.     )

_____

ABBOTT LABORATORIES, INC.;         )   On Petition for Administrative Review
ARCELORMITTAL USA; CATERPILLAR     )   from the Illinois Commerce Commission.
INC.; CORN PRODUCTS                )
INTERNATIONAL, INC.; DAIMLER       )
CHRYSLER CORPORATION; ENBRIDGE     )
ENERGY, LP; EXXONMOBIL; FORD       )
COMPANY; MERCHANDISE MART;         )
STERLING STEEL COMPANY, LLC;       )
THERMAL CHICAGO COOLING, INC.;     )
CITCO, INC.; GENERAL IRON          )
INDUSTRIES, INC.,                  )
                                   )
     Petitioners,  )
                                   )
v.                                 )   No. 07--0566
                                   )
ILLINOIS COMMERCE COMMISSION;      )
COMMONWEALTH EDISON COMPANY;       )
THE PEOPLE OF THE STATE OF ILLINOIS)
ex rel. LISA MADIGAN, THE ATTORNEY )
GENERAL; AARP; AARP ILLINOIS;      )
BLUESTAR ENERGY SERVICES, INC.;    )

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008, 1--08--3030, 1--08--3054, 1--08--3313 cons.

BUILDING OWNERS AND MANAGERS )
ASSOCIATION OF CHICAGO; CHICAGO )
TRANSIT AUTHORITY; CITIZENS )
UTILITY BOARD; CHRYSLER, LLC; THE )
CITY OF CHICAGO; THE COMMERCIAL )
COMMERCIAL GROUP (styled as such )
collectively from the following petitioners: Best )
Buy Company, Inc.; J.C. Penney Corporation, )
Inc.; Macy's, Inc.; Walmart Stores, Inc.); )
CONSTELLATION ENERGY )
COMMODITIES GROUP, INC.; )
CONSTELLATION NEWENERGY, INC.; )
UNITED STATES DEPARTMENT OF )
ENERGY; INTERNATIONAL )
BROTHERHOOD OF ELECTRICAL )
WORKERS LOCAL UNION NO. 15, )
AFL-CIO; NORTHEAST ILLINOIS )
REGIONAL COMMUTER RAILROAD )
CORPORATION, d/b/a Metra; NUCOR )
STEEL KANKAKEE, INC.; THE KROGER )
COMPANY; THE COALITION TO )
REQUEST EQUITABLE ALLOCATION )
OF COSTS TOGETHER, a/k/a "REACT" )
styled as such collectively from the following )
petitioners; A. Finkl and Sons Company; )
Alsip Paper Condominium Association; )
Aux Sable Liquid Products, LP; The City )
of Chicago; Commerce Energy, Inc.; )
Flint Hills Resources, LLC; Integrys Energy )
Services, Inc.; Metropolitan Water )
Reclamation District of Greater Chicago; )
PDV Midwest Refining, LLC; United Airlines, )
Inc.; Wells Manufacturing, Inc.); )
RETAIL ENERGY SUPPLY ASSOCIATION, )
a/k/a "RESA" (styled as such collectively from )
the following petitioners: Commerce Energy, )
Inc.; Consolidated Edison Solutions, Inc.; )
Direct Energy Services, LLC; Gexa Energy; )
Hess Corporation; Intergrys Energy Services, )
Inc.; Liberty Power Corporation; Reliant Energy )
Retail Services, LLC; Sempra Energy Solutions; )
Strategic Energy, LLC; Suez Energy Resources )
NA, Inc.; US Energy Savings Corporation); )
and UNIVERSITY OF ILLINOIS, )

)
Respondents.                    )

---

JUSTICE BURKE delivered the opinion of the court:

Commonwealth Edison Company (ComEd) is a public utility company that distributes electricity to consumers in northern Illinois. ComEd petitioned the Illinois Commerce Commission (Commission) to restructure and alter the rates ComEd charges, seeking a $360 million increase. ComEd calculated its revenue requirement using 2006 as an historical "test year" and included certain new distribution assets, referred to as "plant." These consolidated appeals arise from the Commission's order granting an increase of about $274 million.

ComEd appeals the order, arguing that the Commission did not grant ComEd full recovery of prudent and reasonable costs of certain employees' salaries and wages. ComEd further asserts that, if we rule against it on issues raised by the other parties, it would be denied the benefit of a bargain that it struck with the Commission's staff (Staff). During the proceedings, ComEd and the Staff recommended that the Commission resolve certain issues in ComEd's favor and, in exchange, ComEd would waive inclusion of certain capital additions in its rate base. ComEd argues that it would be manifestly unfair to modify the agreement without allowing ComEd to add those capital additions to its rate base.

The Illinois Industrial Energy Consumers (IIEC), which includes Abbott Laboratories, Inc., and other large electricity consumers, intervened in the proceedings, to challenge the proposed rate increase. On appeal, IIEC argues that the Commission erred in allowing for post-test-year plant additions in the rate base without also recognizing a setoff for post-test-year changes in accumulated depreciation in the existing plant. IIEC argues that the order unlawfully inflates ComEd's rate base,

violates test-year requirements as set forth in case law and the Commission's own rules, and misapprehends the Commission's duty to decide a case exclusively on the record before it, regardless of how the Commission decided the same issue in the past.

The Attorney General (AG) and the Citizens Utility Board (CUB) intervened separately to protect the rights of consumers to "just and reasonable" rates as prescribed by the Public Utilities Act (Act) (220 ILCS 5/1--101 et seq. (West 2006)). AG and CUB also filed notices of appeal, appearing collectively as the "Government and Residential Consumer Petitioners" (GC Petitioners). GC Petitioners echo IIEC's argument that the Commission erred in not accounting for the post-test-year changes in accumulated depreciation of the existing plant. GC Petitioners also challenge the Commission's approval of "Rider SMP," which ComEd proposed to immediately recoup the costs of modernizing its delivery system toward a "smart grid," including a new technology called advanced metering infrastructure (AMI) that would allow meter reader and supervisor positions to be phased out.

The Building Owners and Managers Association of Chicago (BOMA) also intervened. On appeal, BOMA alleges that the Commission's order subjects nonresidential space-heating customers to unreasonable rate increases and discriminatory treatment in violation of the Act. BOMA asks this court to order the Commission to provide rate relief to the nonresidential space-heating customers.

We hold that (1) the Commission heard substantial evidence to support excluding from ComEd's recoverable operating expenses 25% of certain labor costs for employees who performed both utility work and merger-related work; (2) the Commission erred in not accounting for the increased accumulated depreciation of the existing plant during the post-test-year period; (3) the Commission erred in implementing Rider SMP, because the rider violates the rule against single-issue

ratemaking; and (4) the Commission did not err in rejecting BOMA's proposal to apply different delivery rates to nonresidential space-heating customers.

JURISDICTION

The Commission entered its final order on September 10, 2008. On October 15, 2008, the Commission denied BOMA's application for rehearing but granted rehearing on two issues raised by ComEd. Two days later, ComEd filed a petition for review in the Appellate Court, Second District (appeal No. 2--08--0959).

On November 3, 2008, the Commission issued a decision denying all the remaining applications for review as well as an amendatory order disposing of ComEd's two issues for rehearing. On that date, AG filed a petition for review in the Appellate Court, First District (appeal No. 1--08--3008). ComEd filed a second petition for review in the Second District (appeal No. 2--08--1037). On November 5, 2008, CUB filed a petition for review in the First District (appeal No. 1--08--3030). On November 10, 2008, BOMA filed a petition for review in the First District (appeal No. 1--08--3054). On December 3, 2008, ComEd filed a third petition for review in the Second District (appeal No. 2--08--1137). On December 4, 2008, IIEC filed its petition for review in the First District (appeal No. 1--08--3313).

On January 6, 2009, the supreme court issued a supervisory order directing the First District to transfer its appeals in this matter to the Second District for consolidation with ComEd's appeals. This court has jurisdiction to consider the appeals pursuant to Supreme Court Rule 335 and section 10--201(a) of the Act. See 155 Ill. 2d R. 335 (direct review of administrative orders in the appellate court); 220 ILCS 5/10--201(a) (West 2008) (appeal allowed within 35 days of rehearing to the

appellate court of any district where the subject matter is situated, and the district first acquiring jurisdiction has and retains jurisdiction over all other appeals).

BACKGROUND

ComEd delivers electricity to more than 3.7 million retail consumers in northern Illinois. Illinois's electric industry underwent certain changes in the late 1990s. In 1997, the General Assembly amended the Act by enacting the Electric Service Customer Choice and Rate Relief Law of 1997 (Rate Relief Law) (220 ILCS 5/16--101 et seq. (West 2006)), which required electric utilities to open their formerly legislatively approved monopoly. See 220 ILCS 5/16--103 (West 2006). Utilities were required to offer delivery services in addition to existing services, at least until an existing service was either abandoned or declared competitive. 220 ILCS 5/16--103 (West 2006). Delivery services are "those services provided by the electric utility that are necessary in order for the transmission and distribution systems to function so that retail customers located in the electric utility's service area can receive electric power and energy from suppliers other than the electric utility." 220 ILCS 5/16--102 (West 2006).

The Rate Relief Law caused change at both the retail and wholesale levels. For instance, utilities were required to offer delivery services in a nondiscriminatory manner to all customers. In response to the new law, ComEd divested itself of its electricity generating assets. See 220 ILCS 5/16--111(g) (West 2006). ComEd became an "integrated distribution company," also known as a "wires company." ComEd's costs now are driven by the requirement that it meet the needs of a maximum number of customers, "regardless of the nature of the usage of customers." Generation of electricity is no longer a consideration. ComEd's costs as a "wires company" do not vary

appreciably over time, as they did when costs were driven by generating electricity. Commonwealth Edison Co. v. Illinois Commerce Comm'n, 398 Ill. App. 3d 510, 513 (2009) (ComEd).

The rates for delivering electricity are calculated separately from the rates for the electric supply itself. 220 ILCS 5/16--109A, 16--111.5 (West 2008). An electric utility like ComEd is entitled to rates that allow it to recover fully its prudent and reasonable costs of service. 220 ILCS 5/16--108(c) (West 2006) (rates "shall allow the electric utility to recover the costs of providing delivery services through its charges").

A rate case is initiated when a utility files tariffs providing for a rate increase and the Commission suspends those tariffs to conduct an investigation and hearing. 220 ILCS 5/9--201 (West 2006). The Commission may approve, reject, or modify the proposed tariffs. Section 9--201(c) of the Act provides that, if the Commission initiates a proceeding concerning the appropriateness of a utility's proposed rates, the utility has the burden of proving that the proposed rates are just and reasonable. 220 ILCS 5/9--201(c) (West 2006).

In establishing the rates that a public utility is to charge its customers, the Commission considers the company's operating costs, rate base, and allowed rate of return. Citizens Utilities Co. v. Illinois Commerce Comm'n, 124 Ill. 2d 195, 200 (1988). Recovery of the utility's operating costs and the return on its rate base is known as the utility's annual revenue requirement. Generally speaking, a utility determines its revenue requirement by adding operating costs to invested capital multiplied by the rate of return. Business & Professional People for the Public Interest v. Illinois Commerce Comm'n, 146 Ill. 2d 175, 195 (1991) (BPI II). "The components of the revenue requirement have frequently been expressed in the formula 'R (revenue requirement) = C (operating

costs) + Ir (invested capital or rate base times rate of return on capital).' " BPI II, 146 Ill. 2d at 195-96, quoting Citizens Utilities Co. v. Illinois Commerce Comm'n, 124 Ill. 2d at 200-01.[1]

The utility's return, or profit, is the product of the utility's allowed rate of return and its rate base. Both factors are determined by the Commission. Section 9--211 of the Act provides that a utility's rate base may include "only the value of such investment which is both prudently incurred and used and useful in providing service to public utility customers." 220 ILCS 5/9--211 (West 2006).

The value of a utility's rate base investment is affected by both new investment and the decline in investment value due to plant depreciation. Companies purchase assets such as computers, copy machines, buildings, and furniture, all of which lose value each day. To give the most accurate portrayal of the economic reality of the business, this depreciation loss must be accounted for in the company's financial statements. Recording depreciation loss affects two accounts: depreciation expense and accumulated depreciation. Accumulated depreciation is the amount of a long-term asset's cost that has been allocated to depreciation expense since the date that the asset was acquired. The purpose of the accumulated depreciation account is to reduce an asset's carrying value to reflect its value loss due to wear, tear, and usage.

Accumulated depreciation reports the amount of an asset's depreciation from the time it was acquired until the date of the balance sheet. The cost of an asset minus its accumulated depreciation is the asset's book value. The accumulated depreciation account balance does not close at the end of each year; therefore, it will increase each year. However, its balance cannot become greater than the cost of the assets.

---

[1] Revenue Requirement = (Operating Costs) + (Rate Base)(Rate of Return).

Accounting is a double entry system of recording debits and credits so that the debits and credits match. To record a depreciation expense (the debit), one must also record the accumulated depreciation (the credit). Thus, when depreciation expense is recorded, there is also a recognition, or recording, of accumulated depreciation. Accumulated depreciation reduces the rate base for that portion of plant investment and net salvage already recouped through rates. R. Hahne, Accounting for Public Utilities, (MB) Rel. No. 23, at 4-15 (October 2006). If depreciation expense is known and measurable, accumulated depreciation is also known and measurable.

The Illinois Administrative Code (Administrative Code) provides that a utility's revenue requirement may be calculated by beginning with costs incurred during a 12-month period known as a "test year," which may be either an historical or a future period. 83 Ill. Adm. Code §287.20, adopted at 27 Ill. Reg. 12380, 12382, eff. August 1, 2003. If an historical test year is chosen, the utility uses any consecutive 12-month period, beginning no more than 24 months before the utility's filing new tariffs, for which actual data are available at the time of filing. 83 Ill. Adm. Code §287.20, adopted at 27 Ill. Reg. 12380, 12382, eff. August 1, 2003. The supreme court has explained that the purpose of the test year rules is "to prevent a utility from overstating its revenue requirement by mismatching low revenue data from one year with high expense data from a different year." BPI II, 146 Ill. 2d at 238.

The historical data may be subject to "pro forma adjustments," which are estimated or calculated adjustments that reflect certain known and measurable changes in post-test-year data as specified in the rules. 83 Ill. Adm. Code §§287.20, 287.40, adopted at 27 Ill. Reg. 12380, 12382-84, eff. August 1, 2003. The pro forma adjustments must reflect changes affecting the ratepayers in plant investment, operating revenues, expenses, and cost of capital where such changes occurred during

the selected historical test year or are reasonably certain to occur within 12 months after the filing date of the tariffs and where the amounts of the changes are determinable. 83 Ill. Adm. Code §287.40, adopted at 27 Ill. Reg. 12380, 12384, eff. August 1, 2003.

THE RATE CASE

On October 17, 2007, ComEd filed tariffs that incorporated a general increase in rates for delivering electricity and revised other terms and conditions of service. See 220 ILCS 5/9--201 (West 2006). ComEd proposed no change in the price of the electricity itself. ComEd asserted that a $360 million increase in its delivery rates was necessary because the existing rates were based on costs that were years out of date.

ComEd used the 2006 calendar year as an historical test year and included certain pro forma adjustments. ComEd proposed to increase its 2006 rate base investment amount by $1,498,317,000 based on new plant that had been or would be implemented over a 21-month period from January 2007 through September 2008.

On November 28, 2007, the Commission suspended ComEd's proposed tariffs and initiated the underlying rate case. The Commission assigned two Administrative Law Judges (ALJs) to take evidence and issue a proposed order. To protect their interests, IIEC, GC Petitioners, and BOMA intervened. Testimony and documentary exhibits were submitted, and evidentiary hearings were held from April 28, 2008, to May 5, 2008.

ComEd asserted that its reasonable and prudent delivery costs included the costs of its investment in new infrastructure placed into service since the last rate case. ComEd sought a pro forma adjustment to the rate base to include certain new plant that had entered or would enter service after the 2006 test year but before the end of the third quarter of 2008. ComEd argued that the costs

it sought to recover were prudently incurred and reasonable in amount and that the plant it included in the rate base was used and useful and necessary to provide delivery services.

ComEd and the Staff submitted a joint recommendation to the Commission. First, based on the evidence, the Commission's rules, and relevant decisions in earlier rate cases, ComEd and the Staff recommended excluding from ComEd's rate base accumulated depreciation and certain taxes. ComEd and the Staff opined that the Commission should not reduce the rate base further by subtracting extra depreciation and deferred taxes, as the intervenors might propose. Second, ComEd and the Staff recommended that ComEd be allowed to include in the rate base new utility facilities placed in service through only the second quarter of 2008 if the Commission approved the joint recommendation as a whole. ComEd's "conditional withdrawal" of its request to include plant additions from the third quarter of 2008 reduced its requested rate base by about $175 million.

On September 10, 2008, the Commission issued its order authorizing ComEd to file new tariffs to implement a $273,573,000 rate increase. The new rates were designed to recover an annual revenue requirement of $1,961,065,000, based in part on the Commission's determination that the value of ComEd's rate base investment was $6,694,039,000. The Commission concluded that the value of ComEd's test-year rate base investment should be increased by the amount of its planned post-test-year plant additions, without recognizing identified post-test-year decreases in existing investment value. Consistent with the recommendation of ComEd and the Staff, the Commission also excluded from the rate base the value of the distribution facilities placed in service in the third quarter of 2008. We address the remaining portions of the Commission's order in our analysis below.

ANALYSIS

We give substantial deference to the decisions of the Commission, in light of its expertise and experience in this area. ComEd, 398 Ill. App. 3d at 514. Accordingly, on appeal, the Commission's findings of fact are considered prima facie true; its orders are considered prima facie reasonable; and the appellant bears the burden of proof on all issues raised. ComEd, 398 Ill. App. 3d at 514.

Though we are not bound by the Commission on questions of law, we " 'will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute,' which in this case is the Commission." ComEd, 398 Ill. App. 3d at 514, quoting Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n, 95 Ill. 2d 142, 152 (1983). Our review is limited to the following matters: (1) whether the Commission acted within its authority; (2) whether it made adequate findings to support its decision; (3) whether the decision was supported by substantial evidence; and (4) whether state or federal constitutional rights were infringed. ComEd, 398 Ill. App. 3d at 514.

In making adequate findings, the Commission is not required to provide findings on each evidentiary claim; its findings are sufficient if they are specific enough to enable the court to make an informed and intelligent review of its order. 220 ILCS 5/10--201(e)(iii) (West 2006); City of Chicago v. Illinois Commerce Comm'n, 281 Ill. App. 3d 617, 623-24 (1996) (City of Chicago II). In other words, it must state the facts essential to its ruling so that the court can properly review the basis for the decision. Business & Professional People for the Public Interest v. Illinois Commerce Commission, 279 Ill. App. 3d 824, 833 (1996).

Moreover, "substantial evidence" means more than a mere scintilla; however, it does not have to rise to the level of a preponderance of the evidence. ComEd, 398 Ill. App. 3d at 514. It is evidence that a " 'reasoning mind would accept as sufficient to support a particular conclusion.' "

ComEd, 398 Ill. App. 3d at 514, quoting Citizens Utility Board v. Illinois Commerce Comm'n, 291 Ill. App. 3d 300, 304 (1997). "Our supreme court has held that deference to the Commission is 'especially appropriate in the area of fixing rates.' " ComEd, 398 Ill. App. 3d at 514, quoting Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n, 19 Ill. 2d 436, 442 (1960). On review, this court can neither reevaluate the credibility or weight of the evidence nor substitute its judgment for that of the Commission. ComEd, 398 Ill. App. 3d at 514.

A.  ComEd's Labor Costs:

ComEd Appeal Nos. 2--08--0959 & 2--08--1037

ComEd argues that the Commission erred by denying full recovery of salary and wages of certain employees. ComEd also argues that its third-quarter 2008 capital additions may be excluded from its rate base only under the conditions of ComEd's voluntary agreement with the Commission's Staff. We address the latter argument in the context of IIEC's appeal of that issue.

In calculating its proposed revenue requirement, ComEd included compensation paid to salaried personnel who supported the delivery services provided to customers. Some of those personnel spent time on a proposed merger between ComEd's eventual parent company, Exelon Corporation (Exelon), and Public Service Enterprise Group Corporation (PSEG). ComEd recognized that this work does not relate to providing electric utility service and should not be charged to customers. Accordingly, ComEd subtracted $5,281,000 of expenses, called "incremental merger costs," from its revenue requirement. However, ComEd maintained that no adjustment should be made to reflect the salaries and benefits of other employees who performed merger-related activities, because those employees performed the work as unpaid overtime. ComEd sought recovery of 100% of the labor costs of those employees.

GC Petitioners objected to ComEd recovering <u>any</u> labor costs attributable to the employees who worked on both the merger and utility business. David Effron, an expert called by GC Petitioners, proposed to reduce ComEd's revenue requirement by an additional $2,546,000, which represented "non-incremental merger costs," or the entire labor cost of the employees who had performed their normal utility functions while also performing work related to the merger.

Effron opined that time spent on merger activities in the test year was not necessary for utility service and that the cost of that time should not be recovered from ratepayers. He disagreed with ComEd's position that the entire salary and benefits of employees who spent time on merger-related activities should be included in the operating expenses. Effron opined, "[t]o the extent that the time of those employees was devoted to merger-related activities, it was not incurred in the provision of utility service in the test year, and it should not be included in the company's revenue requirement. It is not clear how the company knows that the time of those employees will be spent performing utility-related duties prospectively, but even assuming that this is correct, it is also possible that it would reduce the time of other employees performing such duties." Effron concluded that, if the employees had performed the merger work for free as ComEd alleges, no cost should be assigned to that work.

ComEd declined its opportunity to cross-examine Effron. However, Kathryn Houtsma and Stacie Frank testified in rebuttal for ComEd. They explained that, when the salaried employees at issue were required to assist with the merger in 2006, they accounted for their time spent on merger activities by charging hours to a separate project code block. However, extra time that those employees spent on utility-related activities was not accounted for elsewhere in the salary and benefits

costs recorded on ComEd's books. Thus, eliminating any of the wages and benefits of those employees would understate ComEd's cost of service.

The Commission found that the employees at issue had performed delivery-service work as well as merger-related work. However, the Commission expressed skepticism as to "whether these same employees would have performed unpaid overtime on delivery service test year activities if not for the merger." The Commission further stated, "it is not clear that the expenses claimed by [ComEd] are representative because of the merger work."

The Commission excluded from the operating costs one-quarter of labor costs associated with the employees who performed both utility-services and merger-related work. Specifically, the Commission disallowed $637,000 as merger-related costs, which was one-quarter of the $2,546,000 in labor costs that Effron had identified as unrecoverable. Thus, the Commission rejected GC Petitioners' proposal to disallow labor costs associated with those employees entirely, but the Commission did not allow ComEd to recover the costs in full, either. The Commission did not explain in detail how it chose the 25% deduction.

On appeal, ComEd argues that the Commission's decision to exclude from the operating costs one-quarter of the costs attributed to the employees who performed utility-services as well as merger-related work is arbitrary and not supported by substantial evidence. The Commission responds that ComEd failed to prove that the employees at issue will not continue to handle both recoverable and unrecoverable work matters in the future. GC Petitioners do not renew their argument that the labor costs of the employees should be excluded entirely.

The parties correctly agree that merger-related expenses are unrecoverable. Thus, the Commission's decision to exclude one-quarter of the challenged labor costs presents two issues: (1)

whether any of the labor costs are attributable to the merger and, (2) if so, how much should be excluded from the operating expenses component of the revenue requirement.

In this case, the Commission's factual findings are adequate because they are specific enough to enable this court to make an informed and intelligent review of its order. See 220 ILCS 5/10--201(e)(iii) (West 2006); City of Chicago II, 281 Ill. App. 3d at 623-24. Moreover, the Commission heard substantial evidence to support excluding from the revenue requirement some of the challenged labor costs. Making a credibility determination, the Commission rejected ComEd's assertion that the employees performed no merger-related work during regular work hours, and the Commission expresses continued skepticism of ComEd's position on appeal. We agree with the Commission that "[a]lthough the Commission partially rejected GC Petitioners' proposed 100% disallowance of the labor costs for employees who allegedly spent unpaid overtime working on the merger, this does not mean that the Commission is obliged to accept a ComEd position which strains credulity; that the work performed by these salaried ComEd employees on merger issues for ComEd and its related affiliates was somehow a matter unrelated to their employment." Indeed, Houtsma and Frank testified for ComEd that the employees were required to perform the merger-related work as part of their employment. This court may neither reevaluate the credibility or weight of the evidence nor substitute its judgment for that of the Commission. ComEd, 398 Ill. App. 3d at 514. Substantial evidence supports the Commission's conclusion that at least some merger-related work was compensated and that ComEd might compensate additional work unrelated to delivery service in the future.

The Commission did not explain in its order why it chose to disallow one-quarter of the challenged labor costs, rather than some other amount. The Commission argues that, once it

identifies a recoverable cost item, such as the labor costs related to the utility-services work performed by the employees, the Commission is not authorized to treat the expense as zero. See Central Illinois Public Service Co. v. Illinois Commerce Comm'n, 5 Ill. 2d 195, 208 (1955) ("when a proponent of a rate change has presented sufficient evidence of his present costs and other material factors, the Commission cannot refuse to pass upon the reasonableness of the proposed change merely because unavoidable uncertainties of economic forecasting make it difficult to project those current figures into the future").

In arguing that we must affirm its calculation, the Commission cites Du Page Utility Co. v. Illinois Commerce Comm'n, 47 Ill. 2d 550 (1971), for the proposition that, in the absence of evidence indicating an appropriate cost recovery from 100% recovery to 100% denial, the Commission is authorized to choose an appropriate amount. In Du Page Utility Co., the Commission disallowed as an operating expense one-half of the compensation of three company officers because the claimed compensation was excessive and out of proportion to the services performed. Du Page Utility Co., 47 Ill. 2d at 560. The utility challenged the deduction as arbitrary, but the supreme court called the argument facetious. The officers admitted that they had no previous experience in managing a utility, they had worked only part time, and they had maintained only minimal contact with the day-to-day operations. Du Page Utility Co., 47 Ill. 2d at 560. None of the officers could produce records of time spent at the utility business, none maintained an office there, and each was active as president of one of three different construction firms. Du Page Utility Co., 47 Ill. 2d at 560. Thus, the supreme court determined that "the Commission was correct in its finding that the larger salaries were not justified." Du Page Utility Co., 47 Ill. 2d at 560.

However, the supreme court rejected the intervenors' attempt to go further and disallow the officers' salaries entirely. <u>Du Page Utility Co.</u>, 47 Ill. 2d at 561. The court concluded that such a result would be arbitrary and against the manifest weight of the evidence in light of the officers' uncontradicted testimony that they performed part-time services that added value to the company. <u>Du Page Utility Co.</u>, 47 Ill. 2d at 561. Showing the Commission deference, the court affirmed the decision to disallow one-half of the compensation of the officers.

Here, the Commission takes the position that it has wide latitude to use its "business judgment" to reach "pragmatic solutions" by filling gaps in the record. To the extent that the Commission's decisions are not arbitrary or capricious and are rooted in credibility determinations, we agree. In <u>Du Page Utility Co.</u>, the supreme court affirmed the Commission's 50% deduction of certain labor costs even though the Commission did not set forth detailed reasons for why it chose that percentage. This case compels a similar result. While we might have found the unrecoverable merger-related labor costs to constitute a different percentage of the costs at issue, our deferential standard of review compels us to affirm the Commission's decision to deduct 25% of the challenged costs.

B. Accumulated Depreciation of Existing Plant During Post-Test-Year Period:

IIEC Appeal No. 1--08--3313

As noted, the Administrative Code permitted ComEd to calculate its revenue requirement by beginning with costs incurred during a 12-month period known as a "test year," which may be either an historical or future period. See 83 Ill. Adm. Code §287.20, adopted at 27 Ill. Reg. 12380, 12382, eff. August 1, 2003. Using data from January 1, 2006, to December 31, 2006, as an historical test year, ComEd calculated its 2006 rate base, which is the plant investment used in setting rates, as

$5,572,917,000. ComEd used its gross plant investment, accumulated depreciation, and accumulated deferred income tax amounts to make the calculation.

The Administrative Code allowed ComEd to make pro forma adjustments to its rate base, including additional plant investment that had occurred or is "reasonably certain to occur subsequent to the historical test year within 12 months after the filing date of the tariffs and where the amounts of the charges are determinable." 83 Ill. Adm. Code. §287.40, adopted at 27 Ill. Reg. 12380, 12384, eff. August 1, 2003. ComEd filed its tariffs on October 17, 2007, and thus was authorized to include pro forma adjustments from the end of the 2006 test year through the first three quarters of 2008. See 83 Ill. Adm. Code §287.40, adopted at 27 Ill. Reg. 12380, 12384, eff. August 1, 2003.

ComEd's proposed pro forma adjustments increased the rate base by $1,498,317,000. The post-test-year adjustment represented mainly plant additions that ComEd planned to make from January 2007 through September 2008, which was the 21-month period following the test year. However, ComEd's increase in accumulated depreciation from January 2007 through September 2008 related only to the new, pro forma plant additions. ComEd failed to account for the way the existing embedded plant would accrue additional accumulated depreciation during the post-test-year period. Factoring in this increase in accumulated depreciation would reduce the net value of ComEd's existing plant, which would create a corresponding reduction in the rate base.

IIEC proposed an adjustment to recognize the increase in accumulated depreciation of the existing plant during the 21-month period of ComEd's planned plant additions. Michael Gorman, an IIEC expert, testified that ComEd's rate base must be adjusted to account for all known and measurable post-test-year changes to the test-year net plant investment. Gorman calculated that

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008,
1--08--3030, 1--08--3054, 1--08--3313 cons.

ComEd's failure to make the matching adjustment would overstate the utility's rate base by $654,505,000, which would result in $93,560,000 in excessive rates per year.

Effron, GC Petitioners' expert, opined that the growth in accumulated depreciation during the post-test-year period is a change that is known and measurable with absolute certainty. Therefore, he opined, it is "clearly inconsistent" for the rate base to reflect plant in service through the end of the post-test-year period but reflect a balance of accumulated depreciation only through the end of the test year.

ComEd and the Staff reached a stipulation on the issue and submitted a recommendation to the Commission. According to the stipulation, ComEd would voluntarily elect not to seek recovery of the cost of plant additions made in the third quarter of 2008. ComEd and the Staff proposed an 18-month post-test-year period of capital additions instead of the 21 months that ComEd had originally requested, and, in exchange, the Staff would recommend that, among other things, the Commission not subtract from the rate base the existing plant's accumulated depreciation during the post-test-year period. By its terms, the stipulation was effective only if the Commission approved all of its provisions.

The ALJs who presided over the evidentiary phase of the case issued a proposed order to the Commission that would allow ComEd to include in its rate base the cost of post-test-year plant additions, but only "to the extent they exceed accumulated depreciation." In its September 10, 2008, order, the Commission allowed ComEd to include in its rate base the post-test-year plant additions but reversed the ALJs' recognition of the change in accumulated depreciation of the existing plant as an offset to the value of the post-test-year plant additions.

Consistent with the ComEd/Staff stipulation, the Commission's order included in the rate base "pro forma capital additions through June 2008 with no reflection of the increase in the accumulated reserve for depreciation on embedded [existing] plant." Thus, the Commission allowed ComEd to avoid the offset for accumulated depreciation of existing plant during the post-test-year period in exchange for forfeiting recovery of the cost of the third quarter 2008 plant additions.

On November 7, 2008, two of the five Commissioners filed a dissenting opinion against the majority's refusal to account for the contemporaneous change in post-test-year accumulated depreciation. The dissent stated that deducting accumulated depreciation in the calculation of a rate base should prevent the utility from earning a further return on investment that has already been recovered through depreciation expense. The dissent concluded that "the failure to record accumulated depreciation on existing embedded plant in the post-test-year period, in which additional plant is being factored into rate base, provides a windfall for the utility and provides an opportunity for the utility to over-earn between rate cases. This action clearly encourages other utilities to extend the duration of the test period as far as possible."

IIEC agrees with the Commission's dissenting opinion. IIEC makes three related arguments in support of the conclusion that the Commission erroneously increased ComEd's rate base by failing to recognize the offset of post-test-year accumulated depreciation in the existing plant. First, IIEC argues that the Commission exceeded its authority because the rate base increase violates section 9--211 of the Act. Second, IIEC argues that the Commission violated sections 287.20 and 287.40 of title 83 of the Administrative Code, as well as established test-year principles, by mismatching 2008 gross plant investment and 2006 test-year accumulated depreciation. Third, IIEC argues that the Commission's decision was distorted by its misapprehension that past decisions affected its duty and

authority to decide this case based only on the record before it. GC Petitioners concur in IIEC's position.

### 1. Section 9--211 of the Act

The Act requires the Commission to establish "just and reasonable" rates. 220 ILCS 5/9--101 (West 2006). Section 9--211 of the Act provides that a utility's rate base may include "only the <u>value</u> of such investment which is both prudently incurred and used and useful in providing service to public utility customers." (Emphasis added.) 220 ILCS 5/9--211 (West 2006). To determine just and reasonable rates, a utility's rate base, operating costs, and revenues are matched over the test year. <u>BPI II</u>, 146 Ill. 2d at 237-38. Here, the dispute on the accumulated depreciation issue is not whether the planned plant additions will be used and useful, but how to measure the value of all the plant in service.

Accumulated depreciation reduces plant investment at original cost by the decline in investment value recorded in the reserve for accumulated depreciation, and it is the basis for determining the capital cost component (rate of return x rate base) of the utility's revenue requirement. Heinz, ComEd's expert, testified that customers pay only for net plant, not for gross plant, which is the cost of the plant at the time of installation. Heinz admitted that ComEd had accounted for depreciation expense and that the accumulated depreciation reduces rate base.

We agree with IIEC and GC Petitioners that the Commission departed from standard utility cost accounting when it used gross plant to measure ComEd's rate base in the new plant additions. In every context other than the post-test-year plant addition proposal, ComEd and the Staff calculated ComEd's rate base investment by offsetting gross plant investment with the accumulated depreciation on all plant in service. ComEd and the Staff accounted for accumulated depreciation for the existing

plant during the 2006 test year and for the plant additions during the post-test-year period, but they did not account for accumulated depreciation of the existing plant during the post-test-year period.

We conclude that the Commission miscalculated the value of the plant investment by recognizing increases in rate base investment value due to post-test-year additions without recognizing contemporaneous offsetting decreases in the value of that investment attributable to ongoing depreciation. Section 9--211 essentially requires the Commission to ensure that a utility's approved rate base does not exceed the investment value that the utility actually uses to provide service. The measure of the amount of investment so dedicated must account for both increases and decreases over a consistent period. Under section 9--211, contemporaneous increases and decreases to rate base are not severable items that can be given disparate treatments. The utility's plant in service and net plant are opposing sides of a coin. The Commission approved a rate base that exceeds the investment value ComEd actually dedicates to utility services. The approval of excess rate base violates section 9--211 by overstating ComEd's revenue requirement. See 220 ILCS 5/9--211 (West 2006).

### 2. The Administrative Code and Test-Year Principles

IIEC argues that the Commission violated sections 287.20 and 287.40 of title 83 of the Administrative Code, as well as corresponding test-year principles, by mismatching 2008 gross plant investment and 2006 test year accumulated depreciation.

The Commission's rules give a utility the discretion to request pro forma adjustments to historical data in the post-test-year period, but those adjustments must account for "all known and measurable changes." 83 Ill. Adm. Code §§287.20, 287.40, adopted at 27 Ill. Reg. 12380, 12382-84, eff. August 1, 2003. Specifically, the Administrative Code requires that the pro forma adjustments

to an historical test year "shall reflect <u>changes affecting the ratepayers</u> in plant investment, operating revenues, expenses, and cost of capital where such changes occurred during the selected historical test year or are reasonably certain to occur subsequent to the historical test year within 12 months after the filing date of the tariffs and where the amounts of the changes are determinable." (Emphasis added.) 83 Ill. Adm. Code §287.40, adopted at 27 Ill. Reg. 12380, 12384, eff. August 1, 2003. The increase in the accumulated depreciation on the existing plant during the post-test-year period, in which the additional plant is being factored into the rate base, is a change that affects ratepayers and therefore must be factored into the rate base. See 83 Ill. Adm. Code §287.40, adopted at 27 Ill. Reg. 12380, 12384, eff. August 1, 2003.

Our conclusion is supported by <u>BPI II</u>. In that case, the utility argued that depreciation is not subject to test-year principles because, if those principles applied, utilities would be forced to choose between filing yearly rate cases or forgoing recovery of the costs of construction incurred during that year. <u>BPI II</u>, 146 Ill. 2d at 238-39. The supreme court disagreed, concluding that depreciation is subject to test-year principles for the following reasons:

> "The rationale for capitalizing construction costs does not mean that depreciation is not an expense. The plants have limited useful lives, and each year that a plant is in service a portion of its useful life is expended. Depreciation recognizes the cost of that portion of the asset which is expended in a given year, regardless of the time period in which the construction costs were actually paid. Thus, even though there is no cash outlay in the current year, depreciation is treated as an operating expense for financial reporting purposes, and more importantly for purposes of determining [the utility's] revenue requirement. For this

reason, we hold that depreciation is an expense subject to test-year principles." BPI II, 146 Ill. 2d at 239.

Accumulated depreciation is simply the amount of a long-term asset's cost that has been allocated to depreciation expense since the asset was acquired. As depreciation of the asset's cost is treated as a recoverable operating expense, accumulated depreciation must also be recognized as a reduction to the rate base for that portion of plant investment and net salvage recouped from the rates. Consistent with the matching requirement, accumulated depreciation is subject to test-year principles because depreciation expense is subject to test-year principles. See BPI II, 146 Ill. 2d at 239. We agree with IIEC and GC Petitioners that ignoring the decline in value of the embedded plant during the post-test-year period artificially boosted the value of ComEd's rate base in violation of test-year principles.

ComEd's reading of the test-year principles to exclude accumulated depreciation for the pro forma period creates an incentive for the utility to always seek upward pro forma adjustments, regardless of any decline in actual net plant, so the utility can recover an amount that ignores accompanying depreciation accumulating over the same period. This interpretation results in a consistently and unavoidably inflated rate base and an inescapably inaccurate picture of the utility's finances. ComEd's interpretation is plainly inconsistent with the Commission's treatment of plant investment where the utility adopts a future test year under section 287.20(b). ComEd's interpretation also is plainly inconsistent with basic matching principles. We hold that, under these circumstances, the Commission abused its discretion.

3. Precedential Effect of the Commission's Prior Decisions

IIEC argues that the Commission's decision on the accumulated depreciation issue was distorted by its misapprehension that past decisions affected its duty and authority to decide this case exclusively on the record presented. GC Petitioners concur in IIEC's position. The Commission's decision, in part, relied upon three of its prior decisions: (1) docket No. 05-0597 (appealed in No. 2--06--1284); (2) docket No. 01--0423; and (3) docket Nos. 07--0241 and 07--0242 (appealed in No. 1--08--2055). The Commission referred to those decisions as "settled precedent" that barred departure from the one-sided post-test-year adjustments. The Commission feared that reaching a contrary result would invite a charge of acting arbitrarily and capriciously.

Illinois courts have consistently held that "decisions of the Commission are not res judicata." See, e.g., A. Finkl & Sons Co. v. Illinois Commerce Comm'n, 250 Ill. App. 3d 317, 323 (1993). The concept of public regulation requires that the Commission have power to deal freely with each situation that comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding. Mississippi River Fuel Corp. v. Illinois Commerce Comm'n, 1 Ill. 2d 509, 513 (1953). A record containing new evidence or argument that implicates past decisions compels reconsideration on the new record and may require a different result. See 220 ILCS 5/10--103 (West 2006) ("any finding, decision or order made by the Commission shall be based exclusively on the record for decision in the case"). Thus, we agree with IIEC that the decisions the Commission cited as precedent did not compel the Commission to disregard the increase in accumulated depreciation of the embedded plant during the post-test-year period.

4. Remand

In its appellate brief, ComEd anticipates the argument of IIEC and GC Petitioners that the Commission erred in failing to recognize the increase in the accumulated depreciation. ComEd

argues that, if we reverse any part of the Commission's approval of the stipulation, we must remand the cause to afford ComEd the opportunity to include in its rate base its third-quarter 2008 plant additions. ComEd contends that the exclusion of the additions can be sustained only under the conditions of ComEd's voluntary agreement with the staff not to include them. ComEd argues that, if the stipulation is voided, it would be "manifestly unfair" to exclude from the rate base plant additions that ComEd would be entitled to include. ComEd implies that we should remand the cause with directions for the Commission to add to the rate base the third-quarter 2008 plant additions because, according to ComEd, the same type of evidence that the Commission accepted as supporting ComEd's plant additions through the second quarter of 2008 also supports including ComEd's third-quarter additions.

GC Petitioners respond that ComEd's voluntary forfeiture of the recovery of the third-quarter additions was a waiver of an earlier claim for greater recovery that was "strategically abandoned." Thus, GC Petitioners argue that we should remand the case with directions for the Commission to deduct from the rate base the accumulated depreciation that the Commission erroneously omitted, without allowing ComEd to petition for recovery of the third-quarter additions. While we agree that the Commission abused its discretion in failing to account for the accumulated depreciation of the existing plant during the post-test-year period, we conclude that unilaterally altering the ComEd/Staff stipulation would be manifestly unfair to ComEd.

However, we also reject ComEd's proposal that we direct the Commission to include the third-quarter additions to the rate base. The Commission did not enter findings of fact regarding the third-quarter 2008 additions, and the Commission is the fact-finding body. BPI II, 146 Ill. 2d at 196

("In the ratemaking scheme, the Commission and not the court is the fact-finding body"). Apart from examining whether the Commission acted outside the scope of its authority or infringed upon a constitutional right, a court is limited to reviewing whether the Commission set out adequate findings of fact supporting its decision and whether the findings are against the manifest weight of the evidence. BPI II, 146 Ill. 2d at 196. Considering that the Commission has not had the opportunity to make findings of fact regarding the third-quarter 2008 plant additions, we decline to direct the Commission to take any action on remand other than allowing ComEd to petition for their inclusion in the rate base.

C.  Rider SMP: System Modernization Project:

GC Petitioners (AG/CUB) Appeal Nos. 1--08--3008 & 1--08--3030

GC Petitioners argue that the Commission erred in increasing ComEd's rate base.  First, GC Petitioners echo IIEC's argument that the Commission violated its rules by failing to account for accumulated depreciation, resulting in unjust and unreasonable rates and an overvalued rate base, in violation of the Act.  Second, GC Petitioners argue that a provision known as Rider SMP is contrary to settled ratemaking principles and is not justified by the evidence.  We addressed the accumulated depreciation issue in the context of IIEC's appeal.

ComEd proposed Rider SMP, a "system modernization project" charge to customers, to immediately recoup the costs of modernizing its delivery system toward a "smart grid." According to ComEd, the rider was new and innovative and created a mechanism for funding discretionary projects that are not necessary for the distribution service.  One of the building blocks of the technology is advanced metering infrastructure (AMI), which consists of a communication system, advanced meters, and computer software and hardware to process the information collected from the

new meters. The first step toward an AMI system is a pilot program called "Phase 0," which involves installing 200,000 advanced meters. AMI would allow ComEd to achieve cost savings and improved efficiency by phasing out 675 full-time meter reader and supervisor positions, eliminating meter reading equipment, improving bill collections, reducing billing errors, and disconnecting nonpaying customers more efficiently. ComEd argued that Rider SMP would give customers the benefits of the technology earlier than might otherwise occur, because ComEd could not afford the project without the rider. As proposed, ComEd would provide the Commission with an annual list of projects for Rider SMP treatment. The Commission would have an opportunity to approve or deny recovery for each project, but the Commission could not alter the list.

The Commission approved Rider SMP for the limited purpose of implementing Phase 0, commending ComEd for its initiative in pursuing a smart grid but criticizing ComEd for taking a project-by-project approach without a clear goal. The Commission noted that "[t]he estimates of cost in the record have varied greatly and the estimates of benefits have been sporadic at best." The Commission further found that "[t]he lack of a consistent, thorough analytic approach to estimating [smart grid] benefits simply highlights another shortcoming: ComEd is asking for special recovery for these projects that--whatever their level, all parties agree--could have long-term economic benefits, but as proposed, ratepayers do not share the economic benefits." The Commission ruled that, after the completion of Phase 0, ComEd may file Rider SMP again to seek recovery for additional smart grid investments.

GC Petitioners argue that we must reverse the approval of Rider SMP because (1) Rider SMP violates the rule against single-issue ratemaking; (2) Rider SMP violates the rule against retroactive ratemaking; (3) Rider SMP violates test-year principles; and (4) ComEd did not prove that Rider

SMP is necessary. We conclude that the Commission committed reversible error because Rider SMP is not supported by substantial evidence. Rider SMP is a classic example of improper single-issue ratemaking because AMI is the type of cost that should be addressed through normal ratemaking procedures. Because we conclude that Rider SMP amounts to improper single-issue ratemaking, we need not consider GC Petitioners' alternative arguments for invalidating it.

The rule against single-issue ratemaking makes it improper to consider in isolation changes in particular portions of a utility's revenue requirement. BPI II, 146 Ill. 2d at 244. The rule ensures that the utility's revenue requirement is based on the utility's aggregate costs and the demand on the utility, rather than on certain specific costs related to a component of its operation. BPI II, 146 Ill. 2d at 244. Often a change in one item of the revenue-requirement formula is offset by a corresponding change in another component of the formula. For instance, certain expenses for one aspect of a utility's business may be offset by savings in another area, thus removing the need for greater revenue. BPI II, 146 Ill. 2d at 244; Finkl, 250 Ill. App. 3d at 325. If rates are increased based solely on one factor, the ratemaking structure becomes distorted because there is no consideration of the changes to the other elements of the revenue formula, such as the operational savings from the improvements. BPI II, 146 Ill. 2d at 244.

Single-issue ratemaking is prohibited because it considers changes in isolation, thereby ignoring potentially offsetting considerations and risking understatement or overstatement of the overall revenue requirement. Citizens Utility Board v. Illinois Commerce Comm'n, 166 Ill. 2d 111, 137 (1995). However, a rider, or automatic adjustment, can change a rate without requiring a utility to delay recovery until it files a general rate case. Citizens Utility Board, 166 Ill. 2d at 133. In its most recent pronouncement on the issue, the supreme court described riders as follows:

"[A] rider mechanism merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return. The prohibition against single-issue ratemaking requires that, in a general base rate proceeding, the Commission must examine all elements of the revenue requirement formula to determine the interaction and overall impact any change will have on the utility's revenue requirement, including its return on investment. The rule does not circumscribe the Commission's ability to approve direct recovery of unique costs through a rider when circumstances warrant such treatment." Citizens Utility Board, 166 Ill. 2d at 138.

Because a rider is a method of single-issue ratemaking, by nature, it is not allowed absent a showing of exceptional circumstances. Finkl, 250 Ill. App. 3d at 326. The risk of single-issue ratemaking requires that all riders be closely scrutinized to prevent understatement or overstatement of the overall revenue requirement. City of Chicago II, 281 Ill. App. 3d at 627. However, the Commission has the power to authorize a rider in a proper case and such authorization will not be reversed absent an abuse of discretion. City of Chicago v. Illinois Commerce Comm'n, 13 Ill. 2d 607, 614 (1958) (City of Chicago I).

### 1. City of Chicago I

In City of Chicago I, the supreme court highlighted the Commission's discretion in selecting the means by which rates are set and costs are recovered and determining the appropriateness of the rider mechanism in certain circumstances. In that case, the intervenors contested an order approving the utility's tariff revision providing for a rider to reflect changes in its wholesale cost of natural gas. In approving the rider, the supreme court noted that the Act, taken as a whole, contemplates that the Commission's power is not limited to determining a mere charge or a particular rate; rather, the

Commission has the power to change, under certain conditions, any part of a rate schedule, rule, or regulation that in any manner affects the rates charged. City of Chicago I, 13 Ill. 2d at 611. The intervenors challenged the rider on the basis that the gas pipeline company, which purchased or produced the gas, was a subsidiary of the distributing company, and thus the distributing company had indirect control over the gas prices it paid. City of Chicago I, 13 Ill. 2d at 614. The supreme court rejected the argument, noting that wholesale gas prices were regulated by federal law that granted the Federal Power Commission authority to fix rates. City of Chicago I, 13 Ill. 2d at 614.

## 2. Finkl

In Finkl, the Commission approved a rider so the utility could recover costs associated with certain demand-side management programs. Finkl, 250 Ill. App. 3d at 319. The Commission concluded that the rider was the most appropriate method of recovery of the costs because " 'the actual expenses are difficult to predict in advance, especially given the fact that neither the Commission nor [the utility] has extensive experience in the implementation of [demand-side] analysis and programs, and may fluctuate from year to year and from month to month.' " Finkl, 250 Ill. App. 3d at 322. The Appellate Court, First District, reversed, concluding that the rider violated the prohibition against single-issue ratemaking because the Commission had authorized the utility to charge customers for the demand-side management program costs without considering whether other factors offset the need for additional charges. Finkl, 250 Ill. App. 3d at 326. The order was an abuse of discretion because it isolated one operating expense for full recovery without considering whether changes in other expenses or increased sales and income obviated the need for increased charges to consumers. Failing to account for such an offset might have resulted in impermissibly charging

ratepayers more to cover the utility's expenses and pay a return to its investors. Finkl, 250 Ill. App. 3d at 326.

The costs covered by the rider in Finkl involved payroll for specifically identified planning and similar positions; personnel training, education, and travel; contractors' and consultants' costs; out-of-pocket promotion and computer costs; and conducting workshops. Finkl, 250 Ill. App. 3d at 327. The First District concluded that "[s]uch costs reveal no greater potential for unexpected, volatile or fluctuating expenses which [the utility] cannot control, than costs incurred in estimating base ratemaking." Finkl, 250 Ill. App. 3d at 327.

### 3. CILCO

In Central Illinois Light Co. v. Illinois Commerce Comm'n, 255 Ill. App. 3d 876 (1993) (CILCO), the First District found that the Commission had not abused its discretion in allowing a rider mechanism for the utility to recover certain coal tar remediation costs. CILCO, 255 Ill. App. 3d at 885. The court noted that the costs were expected to vary widely from year to year, depending on the type of remediation activities: from a few thousand dollars for investigation costs to millions of dollars for cleanup costs. The court viewed the costs as the type of unexpected, volatile, and fluctuating costs that are more efficiently addressed through a rider mechanism. CILCO, 255 Ill. App. 3d at 885.

The CILCO court interpreted Finkl as holding simply that the Commission had abused its discretion in allowing a rider recovery mechanism for the demand-side management costs at issue. The CILCO court did not read Finkl broadly "as holding that the Commission does not have the authority to allow recovery of costs through riders." CILCO, 255 Ill. App. 3d at 885.

### 4. City of Chicago II

In City of Chicago II, the city charged the utility a franchise fee for customers living within the municipality, and the utility recovered the expense through the general rates it charged all its customers. Finding the recovery unfair, the Commission ordered the utility to remove local franchise fees and other franchise costs from base rates for all its customers and to localize recovery of those costs by adding a separate line-item charge on the bills of customers who reside in the city. Under the order, residents of the city were to pay a pro rata share of the franchise fee that the city charged the utility, while residents of other municipalities were to pay their share of franchise costs imposed by their own municipalities. City of Chicago II, 281 Ill. App. 3d at 619.

The First District affirmed the Commission's proposed restructuring of the rates, again noting that Finkl did not limit the use of a rider to only those cases where expenses are unexpected, volatile, or fluctuating. City of Chicago II, 281 Ill. App. 3d at 628. The court concluded that the rider was "a reallocation which did not have any impact whatsoever on [the utility's] overall revenue requirement." City of Chicago II, 281 Ill. App. 3d at 629. The court emphasized that the franchise fee already was included in the utility's overall rate structure and, therefore, the rider merely facilitated direct recovery of a particular cost, without direct impact on the utility's rate of return. City of Chicago II, 281 Ill. App. 3d at 629.

### 5. Citizens Utility Board

In Citizens Utility Board, the Commission approved a rider allowing electric utilities to recover expenses created by their liability under federal and state environmental law. The costs at issue were incurred to remediate environmental damage from coal tar residue found at former manufactured-gas-plant sites. Citizens Utility Board, 166 Ill. 2d at 116. Noting that a rider mechanism is effective and appropriate for cost recovery when a utility is faced with unexpected,

volatile, or fluctuating expenses, the supreme court concluded that using the rider mechanism, outside the context of a traditional rate proceeding, did not violate the prohibition against single-issue ratemaking. Citizens Utility Board, 166 Ill. 2d at 139. The court emphasized the Commission's finding that there were wide variations and difficulties in forecasting the costs of investigation and remediation activities. Citizens Utility Board, 166 Ill. 2d at 138. Thus, the court held that "riders can generally be expected to provide a more accurate and efficient means of tracking costs and matching such costs with recoveries than would base rate recovery methods." Citizens Utility Board, 166 Ill. 2d at 138-39.

From this line of cases, we glean a guiding principle for testing a rider's validity: the Commission has discretion to approve a utility's proposed rider mechanism to recover a particular cost if (1) the cost is imposed upon the utility by an external circumstance over which the utility has no control and (2) the cost does not affect the utility's revenue requirement. In other words, a rider is appropriate only if the utility cannot influence the cost (Citizen's Utility Board, 166 Ill. 2d at 138 ("a rider mechanism is effective and appropriate for cost recovery when a utility is faced with unexpected, volatile, or fluctuating expenses")) and the expense is a pass-through item that does not change other expenses or increase income (Citizen's Utility Board, 166 Ill. 2d at 138 (a valid rider has no "direct impact on the utility's rate of return")).

Our test reconciles the approval of diverse riders, including (1) a rider to recoup increases in the wholesale cost of natural gas, where the cost was set by a federal agency (City of Chicago I, 13 Ill. 2d at 614); (2) a rider to recoup expenses for government-mandated environmental remediation (Citizens Utility Board, 166 Ill. 2d at 138-39; CILCO, 255 Ill. App. 3d at 885); and (3) a rider to recoup a franchise fee that a municipality charges the utility (City of Chicago II, 281 Ill. App. 3d at

-41-

628-29). In each instance, the expense was an externality imposed on the utility, and the expense was passed directly on to the consumer without affecting the utility's return on investment.

Our test also explains the rejection of the rider for payroll expenses of demand-side management programs (Finkl, 250 Ill. App. 3d at 327). In Finkl, the rider was declared invalid because the proposed recovery was for expenses that were completely within the utility's control. Furthermore, the Commission had not considered whether changes in other expenses or increased sales and income obviated the need for the added charges to customers. Finkl, 250 Ill. App. 3d at 326.

Rider SMP does not meet the criteria to warrant single-issue ratemaking. The expenses related to AMI and the smart grid technologies, including Phase 0, are not unexpected, volatile, or fluctuating, as ComEd alone dictates the program's scope and, therefore, its costs. The capital costs associated with AMI and the smart grid technologies are not the result of legislative mandate, but rather are the result of ComEd's decision to innovate to reduce other costs. ComEd can cover the expenses by a fiscal and operational plan that is completely within the utility's control. The Commission heard no evidence that the system modernization costs might produce unacceptable financial outcomes if not afforded special treatment.

In fact, ComEd proposed Rider SMP precisely because the improvements are expected to reduce other expenses and increase income in the long term, which affects the utility's revenue requirement. To allow Rider SMP would be to improperly consider in isolation changes in a particular portion of a utility's revenue requirement. See BPI II, 146 Ill. 2d at 244. The system modernization program is desirable precisely because the increased costs would be more than offset by a positive, corresponding change in another component of the revenue requirement formula.

Increasing the rates based solely on the costs of the program would distort the ratemaking structure. See BPI II, 146 Ill. 2d at 244. The evidence showed that ComEd historically has invested in capital distribution improvements and recouped those costs through traditional ratemaking procedures, and the system modernization program should be treated no differently. We conclude that the Commission abused its discretion, and we reverse Rider SMP because it constitutes improper single-issue ratemaking that is not justified by any special circumstances. See Finkl, 250 Ill. App. 3d at 327 (the Commission erred as a matter of law in allowing rider costs normally recovered through the usual ratemaking procedure).

D. Rider 25: Nonresidential Space-heating Customers:

BOMA Appeal No. 1--08--3054

In 2006, the Commission allowed the termination of a provision known as Rider 25, and BOMA appealed to this court. ComEd, 398 Ill. App. 3d at 522. Rider 25 had established a preferential rate for certain nonresidential space-heating customers, including BOMA's members. Instituted at a time when ComEd generated electricity, Rider 25 was created to encourage the use of electricity during the off-peak, winter months to balance usage with the peak summer months when air conditioning is widely used. The goal was for ComEd's power plants to operate at peak efficiency throughout the year.

When the Commission eliminated Rider 25, the rates charged to BOMA members were increased to match those paid by other customers. Pointing out that numerous building owners had equipped their buildings with electric space heaters in reliance on Rider 25, BOMA argued that paying the new rates would result in "rate shock" and that the alternative of replacing the current

-43-

heating systems with nonelectrical systems would be prohibitively expensive. ComEd, 398 Ill. App. 3d at 522.

We affirmed the Commission's decision to do away with Rider 25. ComEd, 398 Ill. App. 3d at 527. We emphasized the undisputed evidence that, because ComEd no longer generates electricity, ComEd's costs to deliver electricity are the same at all times during the year. The end-use characteristics of ComEd's customers do not affect its costs of providing delivery service. ComEd, 398 Ill. App. 3d at 526.

In this rate case, BOMA proposed that the Commission reinstate Rider 25, thereby creating a rate structure that differentiates between nonresidential customers depending on whether they use electricity for space heating. ComEd responded that doing so would give space-heating customers an unwarranted rate subsidy that would not reflect the cost of service.

The Commission approved rates that differentiate residential customer classes based on their use of electric space heating. BOMA requested and was denied similar treatment for nonresidential customers. The Commission rejected BOMA's proposal to establish a separate class or distribution charge for nonresidential electric space-heating customers, finding that Rider 25 was not cost justified and should not be reinstated. The Commission concluded as follows:

"ComEd no longer has generating capacity and Rider 25 has been eliminated. Supply charges are not the subject of this proceeding. There is no evidence that delivery service costs vary seasonally. The record shows that distribution facilities must be planned and built to meet customers' maximum loads, regardless of when those may occur. There is no basis in this record to conclude that it costs ComEd less to serve nonresidential customers who use

some of their electric service for space heating. Nor is there a public policy issue which would justify a deviation from a cost causing allocation."

BOMA revisits Rider 25 in this appeal. BOMA argues that the Commission's order violates the Act by increasing the rates ComEd charges to BOMA's nonresidential electric space-heating members. First, BOMA argues that the change amounts to unreasonable discrimination between classes of service. Second, BOMA argues that the change is not justified on the basis of cost. Third, BOMA argues that the nonresidential space-heating customers are improperly subsidizing nonspace-heating customers within the same customer class. Finally, BOMA contends that the Commission failed to consider BOMA's substantial evidence to support these theories.

The Commission's evidentiary conclusion is prima facie true (see 220 ILCS 5/10--201(d) (West 2006)), and we defer to its factual findings. To obtain a reversal of the Commission's findings on this issue, BOMA must prove that the opposite conclusion is clearly evident. Continental Mobile Telephone Co. v. Illinois Commerce Comm'n, 269 Ill. App. 3d 161, 171 (1994). For the following reasons, we conclude that BOMA has failed to meet this burden.

1. Sufficiency of the Evidence

We first address BOMA's last issue: whether the Commission's rejection of Rider 25 is supported by substantial evidence. The Commission placed nonresidential space-heating and nonspace-heating customers in the same rate class based on the factual finding that there is no evidence that it costs ComEd less to deliver electricity to nonresidential space-heating customers than to nonresidential nonspace-heating customers.

Paul Crumrine, ComEd's then-director of regulatory strategies and services, testified regarding the history and purpose of Rider 25, why it is no longer necessary, and how reinstating it would

create an unfair subsidy for BOMA's members. Crumrine stated that Rider 25 is a relic from the pre-restructuring era when electricity came from generators owned by ComEd, when electricity supply costs at those plants were significantly lower in the winter, and when both supply and delivery costs were recovered under a single, "bundled" charge. Supply and delivery rates are now priced and regulated separately, or "unbundled," and any seasonal differences in energy costs should be reflected only in supply charges, not in the delivery rates set by the Commission in this case. He also opined that space-heating customers' higher winter use does not affect their delivery costs. Distribution facilities must be planned and built to meet customers' maximum use, regardless of the season in which it occurs or whether that energy is being used for space heat or for some other purpose. As a result, the costs of distribution service are not lower for nonresidential space-heating customers. Crumrine concluded that, whatever sense Rider 25 might have made before deregulation, when ComEd owned generation facilities and the costs of power production varied seasonally, Rider 25 is no longer justified by cost. Reinstating Rider 25 would, therefore, create an unjustified subsidy of nonresidential space-heating customers. The Commission was free to base its factual finding on Crumrine's testimony, the Commission's finding deserves deference, and we conclude that the decision is supported by substantial evidence.

## 2. Discrimination Claim

Section 9--241 of the Act provides that no public utility shall, as to rates or other charges, services, facilities, or any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage; and no public utility shall establish or maintain any unreasonable difference as to rates or other charges,

services, facilities, or any other respect, either as between localities or as between classes of service. 220 ILCS 5/9--241 (West 2006).

BOMA argues that, by <u>not</u> differentiating the nonresidential customer classes based on space-heating use, the Commission approves discriminatory treatment between rates and classes of customers, in violation of section 9--241 of the Act. In support of this position, BOMA points to evidence that, as to <u>residential</u> customers, it costs less to deliver electricity to space-heating customers than to nonspace-heating customers. The difference in the delivery cost results in different rates for the two classes of residential customers: the space-heating customers pay less than the nonspace-heating customers. BOMA argues that Rider 25 is necessary to carry over the same rate differential to <u>nonresidential</u> customers so that the space-heating customers pay less than the nonspace-heating customers.

The Commission responds that BOMA did not demonstrate that residential and nonresidential space-heating customers share characteristics that affect the cost of delivery. Simply because certain residential and nonresidential customers may use some of their electricity for space heat does not establish that the other uses by the two groups are sufficiently alike that the rate differential should apply to both. The Commission emphasizes evidence that the facilities charge for a residential space-heating customer is less than for a residential nonspace-heating customer, which creates two different revenue requirements for ComEd. The difference in the revenue requirements for the two classes of residential customers is rooted in the number of customers and their usage. The Commission stated in its order that the record is devoid of evidence that it costs ComEd less to supply electricity to nonresidential <u>space-heating</u> customers than to nonresidential <u>nonspace-heating</u> customers, and we defer to that factual finding.

### 3. Cost Justification

BOMA argues that the rate increases for nonresidential space-heating customers are not justified on the basis of cost. BOMA again cites the reduced cost to supply electricity to residential space-heating customers as a reason for charging less to nonresidential space-heating customers, including BOMA's members. BOMA states that it "submitted uncontroverted evidence that parallels are apparent for the nonresidential customers, and nonresidential customers that heat with electric spaceheat pay more for electricity on a per unit basis than customers that heat with some other fuel source." However, BOMA's citation to the record for this proposition is not to evidence at all; it is to the argument portion of a pleading, presented to the Commission, that a cost differential for the two classes of nonresidential customers may be inferred from the data available for the two classes of residential customers.

BOMA has never presented empirical data that the cost of delivering electricity to a nonresidential customer varies based on the customer's use of some of that electricity for space heat. Apparently, such data is available to show the cost differential for residential customers, and BOMA does not assert that data for nonresidential customers cannot also be collected. Rather than focusing on measurable delivery costs, BOMA relies on evidence that its nonresidential space-heating members have incurred a steep increase in energy costs since the elimination of Rider 25. However, it is undisputed that Rider 25 established a subsidy for BOMA's members such that the rates charged were not based on the costs of delivery. Thus, the evidence of the rate increase is consistent with the elimination of Rider 25, in that rates were brought in line with actual delivery costs. The rate increase is not proof that the former treatment of nonresidential space-heating customers was based on the costs of delivery and the current treatment is not.

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008,
1--08--3030, 1--08--3054, 1--08--3313 cons.

The Commission asserts that the new rates are based on costs, and the Commission stated in its order that delivery costs no longer vary seasonally. The record shows that delivery facilities must be planned and built to meet customers' maximum loads whenever they occur, and there is no basis to conclude that it costs ComEd less to deliver electricity to nonresidential customers if they use some of the electricity for space heat. ComEd witnesses Alongi and Jones testified that there was "absolutely no cost based justification" to set nonresidential distribution facilities charges as BOMA had proposed. Thus, when the rates are the same for all nonresidential customers--regardless of whether they use space heat--the rates are based on costs.

### 4. Subsidization Claim

BOMA also argues that the elimination of Rider 25 has resulted in nonresidential space-heating customers improperly subsidizing other nonresidential customers who do not use space heat. The Commission determined that it costs the same to deliver electricity to all nonresidential customers and, therefore, the nonresidential customers all pay the same rate. The Commission heard substantial evidence from which to draw this conclusion. The space-heating customers pay more for electricity simply because they use more electricity than nonspace-heating customers. Therefore, there is no improper subsidy. The Commission could rely on ComEd's testimony that, since ComEd no longer generates electricity, there is no longer a reason to charge nonresidential space-heating customers less than nonresidential nonspace-heating customers, and to do so would actually amount to an improper subsidy in itself. Also, the Commission could rely on ComEd's testimony that it did not analyze BOMA's proposed discount because it was based on an outdated cost of service study.

### CONCLUSION

Nos. 2--08--0959, 2--08--1037, 2--08--1137, 1--08--3008,
1--08--3030, 1--08--3054, 1--08--3313 cons.

We hold that (1) the Commission heard substantial evidence to support excluding from the operating costs 25% of the challenged labor costs for ComEd employees who worked on both utility-delivery services and merger work; (2) the Commission abused its discretion in excluding from the rate base the increase in accumulated depreciation of existing plant during the post-test-year period; (3) the Commission abused its discretion in approving Rider SMP, because the rider amounts to improper single-issue ratemaking; and (4) the Commission did not abuse its discretion in rejecting Rider 25, because the rider was not cost justified and would have improperly subsidized nonresidential customers who use space heat. We remand the cause for the Commission to revisit the accumulated depreciation issue, including allowing ComEd to request recovery of the aggregate cost of the third-quarter 2008 plant additions. We express no opinion as to whether the Commission should include in the rate base those costs, but we note that ComEd has the burden of proof on remand.

For the preceding reasons, the decision of the Commission is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded.

HUTCHINSON and HUDSON, JJ., concur.