# ILLINOIS OFFICIAL REPORTS

## Appellate Court

***People ex rel. Madigan v. Illinois Commerce Comm'n*, 2012 IL App (2d) 100024**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of the State of Illinois, Petitioner, v. ILLINOIS COMMERCE COMMISSION, COMMONWEALTH EDISON COMPANY, *et al.*, Respondents. |
| District & No. | Second District<br>Docket No. 2-10-0024 |
| Filed | March 19, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a ratemaking case seeking to recoup the costs of modernizing respondent's electrical delivery system toward a "smart grid," the decision of the Illinois Commerce Commission approving riders allowing the recovery of the cost of installing new meters that would eliminate the need for meter readers was reversed on the ground that the riders amounted to improper single-issue ratemaking barred by collateral estoppel and the law of the case. |
| Decision Under Review | Petition for review of order of Illinois Commerce Commission. |
| Judgment | Reversed. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Paul Berks, Assistant Attorney General, of counsel), for petitioner.

John P. Kelliher, of Illinois Commerce Commission, of Chicago, for respondent Illinois Commerce Commission.

E. Glenn Rippie, John P. Ratnaswamy, and Carla Scarsella, all of Rooney Rippie & Ratnaswamy LLP, and Barry Levenstam and Irina Y. Dmitrieva, both of Jenner & Block LLP, both of Chicago, for respondent Commonwealth Edison Company.

Panel

JUSTICE BURKE delivered the judgment of the court, with opinion.

Justices McLaren and Schostok concurred in the judgment and opinion.

## OPINION

¶ 1     Commonwealth Edison Company (ComEd) is a public utility company that distributes electricity to consumers in northern Illinois. In October 2007, ComEd petitioned the Illinois Commerce Commission (Commission) to restructure and alter the rates ComEd charges, seeking a $360 million increase. ComEd calculated its revenue requirement using 2006 as an historical "test year" and included certain new distribution assets, referred to as "plant." The Commission ultimately granted ComEd a rate increase of about $274 million.

¶ 2     As part of the rate case, the Commission approved "Rider SMP," which ComEd had proposed to immediately recoup the costs of modernizing its delivery system toward a "smart grid," including a new technology called advanced metering infrastructure (AMI) that would allow meter reader and supervisor positions to be phased out. On appeal, the Attorney General (AG) and the Citizens Utility Board (CUB) challenged Rider SMP, having intervened separately to protect the rights of consumers to "just and reasonable" rates as prescribed by the Public Utilities Act (Act) (220 ILCS 5/1-101 *et seq.* (West 2006)). See *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 389, 409-15 (2010) (*ComEd*).

¶ 3     While the appeal in *ComEd* was pending, ComEd petitioned the Commission to implement the order that had authorized Rider SMP. Specifically, ComEd sought approval to recover through the rider the costs of installing 141,000 AMI meters and implementing a "Customer Application Program" (CAP) designed to measure how customers respond to the new technology. The Commission ruled that ComEd could recoup through the rider the costs of 131,000 AMI meters and the CAP. The AG filed a notice of appeal from the Commission's implementation order, and we stayed the appeal while *ComEd* was pending.

¶ 4     On September 30, 2010, we reversed the authorization order. We held that the Commission erred in approving Rider SMP, because the rider violates the rule against single-issue ratemaking. *ComEd*, 405 Ill. App. 3d at 415. On April 12, 2011, after we denied ComEd's petition for rehearing and the supreme court denied ComEd's petitions for leave to appeal, we lifted the stay on this appeal of the implementation order.

¶ 5     On appeal, the AG argues that (1) principles of collateral estoppel and the law of the case bar ComEd and the Commission from relitigating whether Rider SMP, now renamed Rider AMP and Rider AMP-CA, is improper single-issue ratemaking; and (2) even if we were to address the issue, Rider AMP and Rider AMP-CA qualify as improper single-issue ratemaking under the test we set forth in *ComEd.* We agree with both of the AG's arguments and reverse the Commission's implementation order as an abuse of discretion.

¶ 6                     THE RATE CASE

¶ 7     On October 17, 2007, ComEd filed tariffs that incorporated a general increase in rates for delivering electricity and revised other terms and conditions of service. See 220 ILCS 5/9-201 (West 2006). ComEd proposed no change in the price of the electricity itself. ComEd asserted that a $360 million increase in its delivery rates was necessary because the existing rates were based on costs that were years out of date.

¶ 8     ComEd used the 2006 calendar year as an historical test year and included certain *pro forma* adjustments. ComEd proposed to increase its 2006 rate base investment amount by $1,498,317,000 based on new plant that had been or would be implemented over a 21-month period from January 2007 through September 2008.

¶ 9     On November 28, 2007, the Commission suspended ComEd's proposed tariffs and initiated the underlying rate case. The Commission assigned two administrative law judges (ALJs) to take evidence and issue a proposed order. To protect their interests, the AG and other parties intervened. Testimony and documentary exhibits were submitted, and evidentiary hearings were held from April 28, 2008, to May 5, 2008.

¶ 10            DOCKET 07-0566: RIDER SMP

¶ 11     As part of the rate case, ComEd proposed Rider SMP, a "system modernization project" charge to customers, to immediately recoup the costs of modernizing its delivery system toward a "smart grid." According to ComEd, the rider was new and innovative and created a mechanism for funding discretionary projects that are not necessary for the distribution service. One of the building blocks of the new technology is AMI, which consists of a communication system, advanced meters, and computer software and hardware to process the information collected from the new meters. The first step toward an AMI system is a pilot program called "Phase 0," which involves installing 200,000 advanced meters. AMI would allow ComEd to save costs and improve efficiency by phasing out 675 full-time meter reader and supervisor positions, eliminating meter reading equipment, improving bill collections, reducing billing errors, and disconnecting nonpaying customers more efficiently. ComEd argued that Rider SMP would give customers the benefits of the technology earlier than might otherwise occur, because ComEd could not afford the project without the rider. As

proposed, ComEd would provide the Commission with an annual list of projects for Rider SMP recovery. The Commission would have an opportunity to approve or deny recovery for each project, but the Commission could not alter the list.

¶ 12    The Commission approved Rider SMP for the limited purpose of implementing Phase 0, commending ComEd for its initiative in pursuing a smart grid but criticizing ComEd for taking a project-by-project approach without a clear goal. The Commission noted that "[t]he estimates of cost in the record have varied greatly and the estimates of benefits have been sporadic at best." The Commission further found that "[t]he lack of a consistent, thorough analytic approach to estimating [smart grid] benefits simply highlights another shortcoming: ComEd is asking for special recovery for these projects that–whatever their level, all parties agree–could have long-term economic benefits, but as proposed, ratepayers do not share the economic benefits." The Commission ruled that, after the completion of Phase 0, ComEd may file Rider SMP again to seek recovery for additional smart grid investments.

¶ 13    On September 10, 2008, the Commission issued its order authorizing ComEd to file new tariffs to implement a $273,573,000 rate increase. The authorization order allowed recovery through a rider for Phase 0 but required ComEd to first "engage in a workshop process with interested stakeholders in order 'to develop project goals, timelines, evaluation criteria and Phase 0 technology selection criteria.' " Because the order required ComEd to define the exact scope of Phase 0 by engaging in discussions with interested parties, the Commission did not "approv[e] a recovery of specific costs" but, rather, required ComEd to file "a request for approval of the AMI pilot after completion of the workshop process." A series of AMI workshops held from December 2008 to May 2009 helped define the parameters of Phase 0 and guide the associated AMI procurement process.

¶ 14                    DOCKET 09-0263: RIDERS AMP & AMP-CA

¶ 15    Pursuant to the Commission's September 10, 2008, authorization order, the next step would be for the Commission to open a new smart grid policy docket in which the Commission and all interested parties would define Illinois policy on the smart grid. Accordingly, on June 1, 2009, after completing the workshop process, ComEd filed a verified petition describing and seeking approval for Phase 0 and the CAP. As contemplated by the authorization order, ComEd sought to recover the costs of these programs through the rider, which already had been approved in the authorization order.

¶ 16    ComEd sought to recover through the rider the Phase 0 costs of installing 141,000 AMI meters and related infrastructure. ComEd proposed placing 100,000 meters in "a demographically varied, yet operationally manageable, footprint" that included nine suburbs west of Chicago. ComEd proposed placing 30,000 more meters in Chicago and 10,000 meters in Elgin. ComEd estimated the costs of those capital investments to be $49.1 million, which it sought to recover through the rider. The CAP was proposed to examine whether and how customers changed their behavior in response to the AMI technology. ComEd estimated the costs of the CAP to be $12.6 million. ComEd proposed amending the rider to allow recovery of the CAP costs in addition to the costs of installing the AMI meters. The rider that had been approved in the rate case was called "Rider SMP" (*ComEd*, 405 Ill. App. 3d at

409), but ComEd subsequently gave it two new names–"Rider AMP" and "Rider AMP-CA"–to represent Phase 0 and the CAP, respectively.

¶ 17    The Commission reduced Phase 0 by 10,000 meters but otherwise approved ComEd's request to recover the costs of Phase 0 and the CAP through the rider that had been approved in the rate case. In doing so, the Commission specifically reaffirmed and relied on its conclusion in the authorization order that the Phase 0 costs could be properly recouped through a rider. The Commission stated, "[w]e find that Rider recovery of the pilot program in this instance is legal and should be adopted as was found in Docket 07-0566."

¶ 18    The AG appealed both the Commission's authorization order, which approved Rider SMP to recover Phase 0 costs, and the implementation order, which approved Riders AMP and AMP-CA for recovery of costs for the specific Phase 0 proposal of 131,000 AMI meters and the CAP. The AG asked this court to stay the appeal of the implementation order pending the outcome of the appeal of the authorization order, because "the same issue the [AG] seeks to raise in this appeal [was] fully briefed and awaiting decision in [the appeal of the authorization order]." We granted the stay.

¶ 19    On September 30, 2010, we issued *ComEd*, in which we reversed the Commission's decision to approve Rider SMP to recover the costs of Phase 0. We held that the rider constituted improper single-issue ratemaking. *ComEd*, 405 Ill. App. 3d at 409-15. After our supreme court denied the Commission and ComEd leave to appeal, we lifted the stay on this appeal of the implementation order.

¶ 20                                    ANALYSIS

¶ 21    On appeal, the AG argues that principles of collateral estoppel and the law of the case bar ComEd and the Commission from relitigating whether Riders AMP and AMP-CA are improper single-issue ratemaking. The AG alternatively contends that, even if we decide to revisit the issue, these riders qualify as improper single-issue ratemaking under the test we set forth in *ComEd*. ComEd and the Commission respond that neither collateral estoppel nor the law of the case applies and that the Commission exercised its discretion properly in approving the implementation riders. We agree with the AG on both counts.

¶ 22                              A. Collateral Estoppel

¶ 23    Whether the doctrine of collateral estoppel applies in this case presents a question of law. Accordingly, our review of the issue is *de novo*. *In re A.W.*, 231 Ill. 2d 92, 99 (2008). "The doctrine of collateral estoppel bars relitigation of an issue that was already decided in a prior case." (Internal quotation marks omitted.) *A.W.*, 231 Ill. 2d at 99. The three requirements for the application of collateral estoppel are "(1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Gumma v. White*, 216 Ill. 2d 23, 38 (2005). Collateral estoppel applies to both legal and factual issues determined in a prior proceeding. *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 79-80 (2001).

¶ 24 The AG argues that all three elements of collateral estoppel are met such that the Commission and ComEd are barred from relitigating the propriety of ComEd recouping the costs of Phase 0 and the CAP through riders. Neither ComEd nor the Commission disputes that there was a final judgment on the merits in the prior adjudication or that the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication. Rather, ComEd and the Commission argue that the issue decided in *ComEd* is not identical to the one presented here. Specifically, they argue that the two appeals involve materially different facts and legal issues and that it would be unfair to invalidate Riders AMP and AMP-CA. We disagree.

¶ 25 The tariffs for Riders AMP and AMP-CA that the Commission approved in the implementation order confirm that these riders are identical to Rider SMP, because the tariffs specifically define the "Advanced Metering Program" (AMP) subject to the riders as "the scaled deployment of advanced metering infrastructure pursuant to the [Commission's] final order in Docket No. 07-0566," but amended to include "AMP customer applications." In fact, ComEd argued before the Commission that Riders AMP and AMP-CA should be approved precisely because they were entirely within the scope of Rider SMP, which had been approved already.

¶ 26 The identical issue presented in *ComEd* and in this appeal is whether the Commission had discretion to authorize rider recovery for ComEd's system modernization pilot program. In approving Riders AMP and AMP-CA, the Commission stated, "We find that Rider recovery of the pilot program in [Docket 09-0263] is legal and should be adopted *as was found in Docket 07-0566*." (Emphasis added.) Thus, the Commission recognized that, for the purpose of determining the riders' validity, the system modernization pilot program addressed in the authorization and implementation orders was the same.

¶ 27 In *ComEd*, we held that the Commission abused its discretion by authorizing Rider SMP for recovery of the costs of implementing Phase 0 of ComEd's system modernization project. *ComEd*, 405 Ill. App. 3d at 409-10. We concluded that, "[b]ecause a rider is a method of single-issue ratemaking, by nature, it is not allowed absent a showing of exceptional circumstances." *ComEd*, 405 Ill. App. 3d at 411. ComEd and the Commission do not dispute that, like Rider SMP, Riders AMP and AMP-CA are intended to immediately recoup the costs of modernizing ComEd's delivery system toward a smart grid. Renaming and amending the rider to include the CAP for monitoring customers' behavior does not change the nature of the program or create novel legal or factual issues regarding the riders' validity.

¶ 28 ComEd argues that the implementation order should be affirmed because applying the doctrine of collateral estoppel would be "unfair" under these circumstances, but the utility cites no authority for the proposition. In light of our previous invalidation of Rider SMP in *ComEd*, the utility suffers no prejudice from being collaterally estopped from advocating the validity of Riders AMP and AMP-CA in this appeal.

¶ 29 In *ComEd*, we held that AMI costs could not be recovered through a rider because it is single-issue ratemaking, and the identical issue is presented here. Therefore, ComEd and the Commission are barred from rearguing the issue of whether rider recovery is proper.

¶ 30                                    B. Law of the Case

¶ 31      Like collateral estoppel, the law-of-the-case doctrine generally bars relitigation of an issue previously decided in the same case. *People v. Tenner*, 206 Ill. 2d 381, 395 (2002). The law-of-the-case doctrine provides that questions of law decided on a previous appeal are binding on the trial court on remand as well as on the appellate court on a subsequent appeal. *Norris v. National Union Fire Insurance Co. of Pittsburgh*, 368 Ill. App. 3d 576, 580 (2006). "However, the doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided; it is not a limit on their power.' " *Norris*, 368 Ill. App. 3d at 580 (quoting *People v. Patterson*, 154 Ill. 2d 414, 468-69 (1992)).

¶ 32      The purpose of the law-of-the-case doctrine is to protect settled expectations of the parties, ensure uniformity of decisions, maintain consistency during the course of a single case, effect proper administration of justice, and bring litigation to an end. *Norris*, 368 Ill. App. 3d at 581. The doctrine is also intended to maintain the prestige of the courts, because, if an appellate court issues contrary opinions on the same issue in the same case, its prestige is undercut. *Norris*, 368 Ill. App. 3d at 581. Thus, when an appellate court reverses a judgment and remands the cause with a specific mandate, the only proper issue on a second appeal is whether the trial court's order on remand is in accord with the mandate. *Norris*, 368 Ill. App. 3d at 581.

¶ 33      In this case, the Commission bifurcated into two proceedings ComEd's request for rider recovery of the costs of AMI. First, the Commission determined the legality of the rider. Second, the Commission enumerated the specific costs recoverable under the rider. We agree with the AG that, notwithstanding this procedural posture, the doctrine of the law of the case applies because the implementation order is part of the same proceedings as those we ruled upon in *ComEd*.

¶ 34      After entering the authorization order, the Commission directed ComEd "to engage in a workshop process with interested stakeholders in order 'to develop project goals, timeliness, evaluation criteria, and Phase 0 technology selection criteria.' " The implementation order at issue in this appeal was entered only because ComEd had not ascertained the size, scope, and other details of Phase 0 when it sought authorization for Rider SMP. *ComEd*, 405 Ill. App. 3d at 409. The Commission's use of two docket numbers in entering the authorization and implementation orders does not transform the rider recovery proceedings into two distinct cases. In fact, while *ComEd* was pending we stayed this appeal because we wished to protect the settled expectations of the parties, ensure uniformity of the decisions, maintain consistency during the course of a single case, effect proper administration of justice, and bring the litigation to an end. See *Norris*, 368 Ill. App. 3d at 581. The additional details that ComEd provided following the workshops does not change the nature of the proceedings.

¶ 35      We note that there are two recognized exceptions to the law-of-the-case doctrine: (1) when a higher reviewing court, subsequent to the lower court's decision, makes a contrary ruling on the same issue; and (2) when a reviewing court finds that its prior decision was palpably erroneous. *Norris*, 368 Ill. App. 3d at 581. Neither exception applies here. We conclude that the law-of-the-case doctrine binds ComEd and the Commission on the

questions of law decided in *ComEd*, including the legality of rider recovery for Phase 0 and the CAP.

¶ 36                          C. Single-Issue Ratemaking

¶ 37    Even if we were to conclude that collateral estoppel and the law of the case do not bar ComEd from seeking approval of Riders AMP and AMP-CA, we would conclude that the Commission abused its discretion in approving the riders, because they amount to improper single-issue ratemaking. "We give substantial deference to the decisions of the Commission, in light of its expertise and experience in this area." *ComEd*, 405 Ill. App. 3d at 397. "Accordingly, on appeal, the Commission's findings of fact are considered *prima facie* true; its orders are considered *prima facie* reasonable; and the appellant bears the burden of proof on all issues raised." *ComEd*, 405 Ill. App. 3d at 397.

¶ 38    "Though we are not bound by the Commission on questions of law, we will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute, which in this case is the Commission." (Internal quotation marks omitted.) *ComEd*, 405 Ill. App. 3d at 397. "Our review is limited to the following matters: (1) whether the Commission acted within its authority; (2) whether it made adequate findings to support its decision; (3) whether the decision was supported by substantial evidence; and (4) whether state or federal constitutional rights were infringed." *ComEd*, 405 Ill. App. 3d at 397-98.

¶ 39    "In making adequate findings, the Commission is not required to provide findings on each evidentiary claim; its findings are sufficient if they are specific enough to enable the court to make an informed and intelligent review of its order." *ComEd*, 405 Ill. App. 3d at 398; see 220 ILCS 5/10-201(e)(iii) (West 2006). "In other words, it must state the facts essential to its ruling so that the court can properly review the basis for the decision." *ComEd*, 405 Ill. App. 3d at 398.

¶ 40    Moreover, "substantial evidence" means more than a mere scintilla; however, it need not rise to the level of a preponderance of the evidence. *ComEd*, 405 Ill. App. 3d at 398. It is evidence that a " 'reasoning mind would accept as sufficient to support a particular conclusion.' " (Internal quotation marks omitted.) *ComEd*, 405 Ill. App. 3d at 398 (quoting *Citizens Utility Board v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 300, 304 (1997)). "Our supreme court has held that deference to the Commission is 'especially appropriate in the area of fixing rates.' " (Internal quotation marks omitted.) *ComEd*, 405 Ill. App. 3d at 398 (quoting *Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Comm'n*, 19 Ill. 2d 436, 442 (1960)). "On review, this court can neither reevaluate the credibility or weight of the evidence nor substitute its judgment for that of the Commission." *ComEd*, 405 Ill. App. 3d at 398.

¶ 41    In *ComEd*, the AG argued that the Commission erred in approving Rider SMP, in part because the approval was contrary to settled ratemaking principles and was not justified by the evidence. We concluded that the Commission committed reversible error because Rider SMP was not supported by substantial evidence. "Rider SMP is a classic example of improper single-issue ratemaking because AMI is the type of cost that should be addressed

through normal ratemaking procedures." *ComEd*, 405 Ill. App. 3d at 410.

¶ 42 "The rule against single-issue ratemaking makes it improper to consider in isolation changes in particular portions of a utility's revenue requirement." *ComEd*, 405 Ill. App. 3d at 410. "The rule ensures that the utility's revenue requirement is based on the utility's *aggregate* costs and the demand on the utility, rather than on certain specific costs related to a component of its operation." (Emphasis in original.) *ComEd*, 405 Ill. App. 3d at 410. "Often a change in one item of the revenue-requirement formula is offset by a corresponding change in another component of the formula." *ComEd*, 405 Ill. App. 3d at 410. "For instance, certain expenses for one aspect of a utility's business may be offset by savings in another area, thus removing the need for greater revenue." *ComEd*, 405 Ill. App. 3d at 410. "If rates are increased based solely on one factor, the ratemaking structure becomes distorted because there is no consideration of the changes to the other elements of the revenue formula, such as the operational savings from the improvements." *ComEd*, 405 Ill. App. 3d at 410.

¶ 43 "Single-issue ratemaking is prohibited because it considers changes in isolation, thereby ignoring potentially offsetting considerations and risking understatement or overstatement of the overall revenue requirement." *ComEd*, 405 Ill. App. 3d at 411. "However, a rider, or automatic adjustment, can change a rate without requiring a utility to delay recovery until it files a general rate case." *ComEd*, 405 Ill. App. 3d at 411. In its most recent pronouncement on the issue, the supreme court described riders as follows:

" '[A] rider mechanism merely facilitates direct recovery of a particular cost, without direct impact on the utility's rate of return. The prohibition against single-issue ratemaking requires that, in a general base rate proceeding, the Commission must examine all elements of the revenue requirement formula to determine the interaction and overall impact any change will have on the utility's revenue requirement, including its return on investment. The rule does not circumscribe the Commission's ability to approve direct recovery of unique costs through a rider when circumstances warrant such treatment.' " *ComEd*, 405 Ill. App. 3d at 411 (quoting *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111, 138 (1995)).

¶ 44 "Because a rider is a method of single-issue ratemaking, by nature, it is not allowed absent a showing of exceptional circumstances." *ComEd*, 405 Ill. App. 3d at 411. "The risk of single-issue ratemaking requires that all riders be closely scrutinized to prevent understatement or overstatement of the overall revenue requirement." *ComEd*, 405 Ill. App. 3d at 411. "However, the Commission has the power to authorize a rider in a proper case and such authorization will not be reversed absent an abuse of discretion." *ComEd*, 405 Ill. App. 3d at 411.

¶ 45 In *ComEd*, we comprehensively reviewed cases involving single-issue ratemaking through riders and fashioned the following test for rider validity:

"[T]he Commission has discretion to approve a utility's proposed rider mechanism to recover a particular cost if (1) the cost is imposed upon the utility by an external circumstance over which the utility has no control and (2) the cost does not affect the utility's revenue requirement. In other words, a rider is appropriate only if the utility cannot influence the cost (*Citizen's Utility Board*, 166 Ill. 2d at 138 ('a rider mechanism

-9-

is effective and appropriate for cost recovery when a utility is faced with unexpected, volatile, or fluctuating expenses')) and the expense is a pass-through item that does not change other expenses or increase income (*Citizen's Utility Board*, 166 Ill. 2d at 138 (a valid rider has no 'direct impact on the utility's rate of return')))." *ComEd*, 405 Ill. App. 3d at 414.

¶ 46    Applying the test, we held that Rider SMP did not meet the criteria to warrant single-issue ratemaking. *ComEd*, 405 Ill. App. 3d at 414. We concluded that the expenses relating to AMI and the smart grid technologies, including Phase 0, were not unexpected, volatile, or fluctuating, as ComEd alone dictated the program's scope and, therefore, its costs. *ComEd*, 405 Ill. App. 3d at 414-15. "The capital costs associated with AMI and the smart grid technologies are not the result of legislative mandate, but rather are the result of ComEd's decision to innovate to reduce other costs." *ComEd*, 405 Ill. App. 3d at 415. "ComEd can cover the expenses by a fiscal and operational plan that is completely within the utility's control." *ComEd*, 405 Ill. App. 3d at 415. We noted that the "Commission heard no evidence that the system modernization costs might produce unacceptable financial outcomes if not afforded special treatment." *ComEd*, 405 Ill. App. 3d at 415.

¶ 47    In this appeal, the Commission and ComEd suggest that rider recovery of the costs of Phase 0 and the CAP is justified by state and federal policies that encourage the modernization of the nation's electricity transmission and distribution system. However, neither the Commission nor ComEd points to any law that *requires* ComEd to implement such a project, which arguably would take the expense out of ComEd's control.

¶ 48    For purposes of testing their validity under ratemaking principles, Rider SMP and Rider AMP are indistinguishable. ComEd proposed Rider SMP, and later Rider AMP, precisely because the improvements were expected to reduce other expenses and increase income in the long term, which are factors that affect the utility's revenue requirement. To allow Rider SMP or Rider AMP would be to improperly consider in isolation changes in a particular portion of a utility's revenue requirement. See *ComEd*, 405 Ill. App. 3d at 415. "The system modernization program is desirable precisely because the increased costs would be more than offset by a positive, corresponding change in another component of the revenue requirement formula. Increasing the rates based solely on the costs of the program would distort the ratemaking structure." *ComEd*, 405 Ill. App. 3d at 415. "The evidence showed that ComEd historically has invested in capital distribution improvements and recouped those costs through traditional ratemaking procedures, and the system modernization program should be treated no differently," regardless of the name that ComEd gives the rider. *ComEd*, 405 Ill. App. 3d at 415. We conclude that the Commission abused its discretion, and we reverse the approval of Rider AMP, because it constitutes improper single-issue ratemaking that is not justified by any special circumstances. See *ComEd*, 405 Ill. App. 3d at 415.

¶ 49    Similarly, Rider AMP-CA does not meet the criteria to warrant single-issue ratemaking. In the authorization order, the Commission required ComEd to complete the workshop process. After doing so, ComEd sought to include another component, the CAP, represented by Rider AMP-CA. Before the Commission, the parties disputed whether recoupment of the CAP costs exceeded the scope of the authorization order, and the Commission concluded that it did not. The Commission concluded that studying customer behavior in response to

AMI technology was part of developing the AMI program, which is what the authorization order compelled ComEd to do. Accordingly, the Commission's implementation order allowed recoupment of the CAP costs.

¶ 50     The Commission's decision to allow the CAP costs to be recovered through a rider must be reversed for the same reason we disallowed recovery for Phase 0: rider recovery for the CAP is prohibited as improper single-issue ratemaking. The CAP does not satisfy the first criterion for rider recovery, because it is a discretionary expense at least partially within the utility's control. ComEd participated in the workshops to work out the details of the program, but in the end, the program was not mandated by any outside authority or imposed upon ComEd. Because the expenses ComEd will incur studying customer responses to AMI technology are entirely within its control, ComEd "can cover the expenses by a fiscal and operational plan that is completely within the utility's control." *ComEd*, 405 Ill. App. 3d at 415. ComEd can incorporate the expenses into test-year ratemaking and address them through normal ratemaking procedures. See *ComEd*, 405 Ill. App. 3d at 410. The expenses, regardless of their alleged uncertainty, are not external factors imposed on the utility that would be passed directly on to the consumer without affecting the utility's return on investment. See *ComEd*, 405 Ill. App. 3d at 414. ComEd and the Commission alternatively argue that *ComEd* was wrongly decided, but we decline their invitation to depart from our analysis in that opinion.

¶ 51                                    CONCLUSION

¶ 52     In *ComEd*, we held that the Commission abused its discretion in approving Rider SMP, because the rider amounts to improper single-issue ratemaking. Consistent with *ComEd* and the procedural background of this appeal, we hold that (1) collateral estoppel and the law of the case bar recovery through Riders AMP and AMP-CA and (2) the Commission abused its discretion in approving Riders AMP and AMP-CA, because, like Rider SMP, they amount to improper single-issue ratemaking.

¶ 53     For the preceding reasons, the decision of the Commission to allow ComEd to recover the costs of Phase 0 and the CAP through Riders AMP and AMP-CA is reversed.

¶ 54     Reversed.